(117 App. Div. 603)

## PEOPLE v. WEINSEIMER.

(Supreme Court, Appellate Division, First Department. February 15, 1907.)

1. EXTORTION—EVIDENCE.

Evidence *held* sufficient to sustain a conviction of the president of a local labor union of extortion, in violation of Pen. Code, § 552, defining such offense as the obtaining of property from another with his consent, induced by the use of force or fear, etc.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Extortion, § 17.]

2. SAME—DAMAGE.

Where, in a prosecution of the president of a local labor union for extortion, it was shown that he would not permit a resumption of work on a building until he was paid an amount of money which he demanded from the plumbing contractor, and that after payment of the money work proceeded without interruption, it was sufficient to sustain a conviction that it appeared that the contractor would have sustained damage if the money had not been paid, without proof of the amount of such damages.

3. SAME—OWNERSHIP OF MONEY.

Where, after a contract had been let for the plumbing of a building, defendant, who was the president of a local plumbers' union, refused to permit the work to proceed until he was paid a certain sum of money by the contractor, it was immaterial, in a prosecution of defendant for extortion, whether the money which the contractor delivered to defendant was his own or that of the owner of the building.

4. CRIMINAL LAW—OTHER OFFENSES—INTENT.

Where, in a prosecution for extortion, it was incumbent on the people to prove defendant's intent to do an unlawful injury to complainant's property in refusing to permit certain plumbing work to be carried on by a contract until defendant was paid a sum of money, evidence of a threat made by defendant to a former contractor for such plumbing that he would call a strike on the building, which threat he subsequently carried out, was admissible to show motive and intent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, §§ 830–832.]

5. SAME—TRIAL—EVIDENCE—LIMITATION.

Where, in a criminal prosecution, it is the opinion of defendant's counsel that certain evidence should be limited, such question should be presented to the court, either at the time the evidence is received or before or after the instructions.

6. SAME—EVIDENCE—OTHER OFFENSES—PRECONCEIVED PLAN.

In a prosecution of the president of a local plumbers' union for extortion in refusing to permit certain plumbing work on a building to proceed until he had been paid a sum of money by the contractor, evidence that before the contractor obtained the work and while it was being performed by another, who was subsequently compelled to surrender it, defendant

obtained an introduction to one of the owners of the building and requested a payment of $3,000 in consideration of a non-strike guaranty during the performance of the plumbing work on the building, was admissible generally to show a previously conceived plan and determination on defendant's part to commit the offense, and was not limited to the issue of motive or intent.

**7. SAME—APPEAL—DISPOSITION OF CAUSE.**

Where an examination of the facts on appeal established defendant's guilt beyond a reasonable doubt, the conviction should be affirmed under Code Cr. Proc. § 542, declaring that after hearing the appeal the court must give judgment without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties.

Appeal from Court of General Sessions, New York County.

Philip Weinseimer was convicted of extortion, and he appeals. Affirmed.

Argued before PATTERSON, P. J., and McLAUGHLIN, LAUGHLIN, HOUGHTON, and SCOTT, JJ.

Mann Trice, for appellant.

Robert C. Taylor, for respondent.

LAUGHLIN, J. The charge upon which the defendant was convicted is, in effect, that on the 31st day of December, 1903, he, then being president of a labor union, obtained from one George J. Essig the sum of $1,000 in money and seven promissory notes aggregating $1,700 by fear, induced by a threat made to Essig, who had a contract for the plumbing work on "The Chatsworth" apartment house on Seventy-Second Street, near Riverside Drive, owned by the Johnson-Kahn Company, that unless said sum of money and notes were delivered to the defendant work could not be resumed on the contract, the men at that time being out on a strike. The provisions of the Penal Code under which the indictment was found and conviction had are sections 552, 553, and 554. Section 552 defines extortion as follows:

"Extortion is the obtaining of property from another, with his consent, induced by a wrongful use of force or fear, or under color of official right."

Section 553 defines "what threats may constitute extortion," so far as material to the appeal, as follows:

"Fear, such as will constitute extortion, may be induced by a threat: (1) To do an unlawful injury to the person or property of the individual threatened, or to any relative of his or to any member of his family."

Section 554 provides that:

"A person who extorts any money or other property from another, under circumstances not amounting to robbery, by means of force or a threat mentioned in the last two sections, is punishable by imprisonment not exceeding five years."

Section 561 of the Penal Code, contained in the same chapter with the sections already quoted, provides that:

"It is immaterial whether a threat made as specified in this chapter, is of things to be done or omitted by the offender, or by any other person."

The defendant was president of Plumbers' Local No. 2 of the city of New York, which was composed of journeymen plumbers. There was

also an organization of master plumbers, known as the "Master Plumbers' Association." There existed between the two associations an agreement by which the members obligated themselves to work for and employ only members of the respective associations. The contract for the plumbing work on this apartment house had been first let to one Rendall, who was not a member of the Master Plumbers' Association, but who employed on the work about 22 plumbers who were members of defendant's union. George F. Johnson, who was president of the Johnson-Kahn Company, was called by the people and testified, in substance, that on or about the 4th day of November, 1903, a man who called upon him, professing that the object of his visit was in regard to an "advertisement in a plumbing journal," disclosed his real purpose to be to inform him that a strike was threatened on the building, and to arrange a meeting between him and one Selly, as "a man who could probably help me out"; that up to this time the company had heard nothing of a threatened strike, but that he was persuaded there was something to it and arranged to meet Mr. Selly the next day; that on being introduced to Selly by the alleged canvasser the next day Selly said he wanted to introduce him to "somebody," and without disclosing who the "somebody" was, or discussing the threatened strike, made an appointment for the following day, at which time he introduced him to the defendant, thereupon leaving them together in Bryant Park; that the defendant then said he was going to call a strike on the building because the owners were "lumping the job" and the contractor was not a member of the Master Plumbers' Association. It seems that the term "lumping" is used to designate a method of doing work where the contractor is only the figurehead for the owner, who purchases the material and assumes all the responsibility in connection with the contract, and the "lumper" merely furnishes the labor and acts as superintendent upon an agreed compensation for his services. Johnson further testified that he denied that the company was "lumping" the contract, and undertook to convince the defendant, who said, "Well, you know we do not have to prove that to anybody but ourselves"; that he suggested he would ask Rendall to join the association, to which the defendant replied, "Well, there is a big likelihood that he won't get in," and then said, "I can fix this matter for you, though," whereupon the witness asked, "How can you fix it?" and the defendant said, "Well, it will cost you some money; you are making considerable out of this job, doing it the way you are, making $10,000, and you ought to give me at least $2,500"; that he informed defendant that that was out of the question, and he did not think the company would give anything, but suggested that after the work was completed, if the company should have no trouble with strikes, it would make the defendant a present of $500, to which the defendant answered that that would not be cigar money for the "bunch," and that he was representing some people down town, and that his union and the boss plumbers had a working agreement, and that there was some one else who had to come in on the "divide," and upon the witness saying, "All right, Mr. Weinsheimer, then that ends it," the defendant said, "Well, you had better think it over and meet me here in a week," which the witness promised to do; and that during this conversation the de-

fendant informed the witness that he was president of the union. The defendant admitted that he had an interview with Johnson at the time and place specified, but claimed that he came on Selly's invitation, who introduced Johnson as a subscriber who wished to talk with the defendant; that Johnson brought up the subject of the trouble and spoke of Rendall not being a member of the association and of desiring to have him join, and apparently as an inducement to obtain the defendant's influence manifested a willingness to give him valuable information concerning the races, and he denied that there was any talk concerning the $3,000 or $2,500, as testified to by Johnson.

Johnson further testified that he met the defendant again in Bryant Park a week later and declined to submit to his demand, but renewed his offer to give him $500 if there should be no strike, to which the defendant replied that that was no proposition at all, and, if the witness would make him a moderately liberal proposition, he might talk business, and on parting the defendant said, "There is no need of being bad friends, when you do get in trouble up there, you can call me up if you like"; and he gave the witness his telephone number. The defendant admitted this meeting, also, but testified that Johnson requested his assistance in getting Rendall into the association, and said to defendant, "If there is any way you can arrange this matter, if you can see that this man was admitted, and there would be no trouble on the job, * * * I will make you a present of $500"—to which the defendant says he replied that there was nothing he could do, but that, if Johnson wanted to make him a present, he could not very well stop him, and he denies that there was any talk on this occasion about the $3,000 or $2,500. This last interview was on or about the 13th of November, and on the 16th the strike was ordered and the men left work. It is conceded, however, that the strike was duly ordered in accordance with the rules and regulations of the union. The court instructed the jury that the evidence was insufficient to warrant them in finding that the defendant "took any part improperly" in bringing it about. After the men struck, and before Essig obtained the contract, the union passed a resolution declaring that it was "the sense of this organization that the men taken out of the shop of Rendall are entitled to waiting time." The owners then entered into a contract with Essig to do the plumbing work. The contract was signed on the 21st day of December, 1903. Essig attempted to commence work the next day, but was informed by Alwater, a delegate of the union, that the men were entitled to "waiting time," which would have to be paid before they resumed their work, but Essig was permitted to do a small repair job and was allowed two men who worked on that day. The court instructed the jury that the demand for waiting time was made by order of Local No. 2, and that the defendant was not responsible therefor. On December 23d Essig saw one Finn, another delegate of the union, who also informed him that the "waiting time" would have to be paid before the work could be resumed. Essig informed the delegates that he was willing to pay the "waiting time," and wanted to know how much it was. The delegates said that they did not know, but would ascertain and inform him. Essig saw no one connected with the work from December 23d until December 28th, when he met Alwater,

who told him that he had been unable to find out how much the "waiting time" was or to whom it was due. Essig then asked if there was any way to get the privilege of the floor at their association, and Alwater, said he would ask the president. On that evening Essig went to the meeting of the union and was introduced to the defendant, who was president, by Alwater. He was desirous of starting the work the next morning, and for the purpose of paying the waiting time he had a certified check in his pocket for $1,000. He asked the defendant for the privilege of the floor, which was refused, and the defendant said that he was too busy to talk with him, but to come around to his office the next day at 12 o'clock, at which time he would see him. It is undisputed that Essig and the defendant had an interview on the 29th of December. Essig testified that he met the defendant on that day pursuant to appointment, and that they went into a café and sat down in one of the booths, whereupon defendant asked to see his contract and he exhibited it to him, at the same time informing him that the job amounted to about $22,000; that he then asked defendant, "Why are you holding my men up," to which the defendant answered, "Waiting time that is due on the job has got to be paid to the men that were pulled out on it with Rendall," to which the witness answered, "I am perfectly willing to pay them and have been," but that he did not know the amount or the names, and asked defendant for that information, to which defendant replied, "I will have the delegates find that out, but that is not in a hurry anyway"; that the witness then said, "If that is not in a hurry, I would like to start the job immediately, and I will leave the check right up with you"; that the defendant then said:

"Now, you ain't in the plumbing business for your health, but to make money; and I ain't running the labor end of it for the love of it either. * * * Now, you have got a $40,000 contract here, and will make about $15,000. What I want is $3,000, and, if you don't give it to me, you nor any other son of a bitch will start that job."

Later on the witness was asked, "When Weinseimer told you that unless the $3,000 were paid neither you nor any other son of a bitch could go to work on that job, did you believe him?" And he answered, "I did."

The witness further testified: That he asked the defendant how he wanted the money, to which the defendant answered:

"I will take $1,000 down. I won't take a check. They will never catch me the way they catched Mr. Parks. The balance we will settle later."

That the witness said he would think over the matter, and the defendant asked how long he wanted to think it over, and, on being informed that he wanted until the following day, replied, "You meet me at my office, 95 Nassau street, between 12 and 1," and gave the witness his telephone number and instructed him to telephone in case he could not come down, so that he, the defendant, would not waste his time. The defendant's version of this interview was that Essig called to assure him of the fact that he had received the contract for this work, and that it was legitimate, and to ascertain if it was satisfactory to the defendant, and was informed that the Master Plumbers' Association

was the organization to decide whether the contract was right, and that
his union had no grievance, except that it required that the "waiting
time" should be paid, and he referred Essig to the delegates Finn and
Alwater to ascertain the amount and to whom it was payable, and he
denied that he made any demand for money. Essig, in rebuttal, denied
the defendant's version of the interview, and further testified that he
met the defendant on the 30th of December, pursuant to the appoint-
ment; that after sending the stenographer out of the room the de-
fendant asked him what he had decided to do and was informed that he
had decided to pay, but thought the amount was too much, and that
$2,500 was enough, to which the defendant replied that he could not
take $2,500; that "I have got to divide it up with other people and the
least I will take is $2,700"; that he then told defendant he would pay
it, and that in answer to an inquiry the defendant said he would take
$1,000 down and the balance in seven notes payable at Essig's shop,
made out in blank with respect to the name of the payee, the first for
$200, and the other six for $250 each, payable, respectively, on the 10th
day of each successive month, and the defendant asked when he would
be ready to pay the money, and was informed "at any time," where-
upon defendant asked the witness to meet him at the same place the
next day; that the witness then asked the defendant if he could start
the job, to which the defendant replied, "No; that ain't in a hurry;
you meet me at the appointed time to-morrow"—which the witness
promised to do. The defendant denied that he had any conversation
with Essig on that day. After the interview with the defendant on the
30th of December, Essig went to the office of the company and inform-
ed the treasurer that he was to pay the defendant $1,000 in cash and
give him seven notes, and the treasurer filled out the notes in accord-
ance with Essig' suggestions which conformed to the directions of the
defendant, and Essig signed them. Essig then surrendered to the
Hamilton Bank the certified check, which on the 28th day of Decem-
ber he had drawn against the proceeds of a $1,000 check received from
the owners for the purpose of paying the "waiting time," and obtained
$1,000 in cash, and on the following day took the notes and cash to
the defendant's office, between 12 and 1 o'clock, pursuant to the ap-
pointment, and, according to his testimony, delivered them to the de-
fendant, who counted the money and put it in his pocket and retained
it, and examined the notes and inquired the name of the witness' bank,
and, on being told that it was the Hamilton Bank, said that he had
changed his mind about having the notes payable at the witness' shop,
and requested that the witness make out seven other notes payable
at the Hamilton Bank, leaving the name of the payee blank as be-
fore, and said that he would have an innocent party sign them and
run them through the bank, or that he might call the witness up and
have him bring the money down to pay the notes, which would be de-
livered as they fell due, to which the witness expressed assent and then
asked if he could start the work and the defendant said, "All right, go
ahead; I will notify the delegates that everything is all right," and the
witness answered, "All right," and departed for the Chatsworth. The
defendant admitted that he had an interview with Essig on this day be-
tween 11 and 12 o'clock, but he testified that the conversation related

to the "waiting time," of which Essig complained as excessive, and denies that he received the money or the notes and the conversation respecting the same. Before going to defendant's office on this day Essig had been at the building, and says, in substance, that two members of the union were there in the morning about 9 o'clock, and five or six before 11:30, but that they did not actually begin the work until after he paid the money to the defendant, although they were preparing to resume work before that hour, and that he had no further difficulty in starting the work satisfactorily; that he did not know who ordered the men to return to work, but that he had no talk with the delegates about the men returning to work at that time and had not sent for them otherwise than his conversation with the defendant. Evidence was introduced in behalf of the defendant tending to show that some of the men resumed work in the morning, but that was controverted. After the work had been resumed, and on the 4th day of January, 1904, Essig paid the "waiting time," which was upwards of $900, and he testifies that on the next day he saw the defendant and delivered to him seven notes in all respects the same as those first prepared, with the exception that the place of payment was changed to the Hamilton Bank, which the defendant received and retained. The seven notes originally prepared and all but the last of the second set, which was not due until August 10th, were received in evidence, as were Essig's check book and the checks. One of the notes was payable on the 10th day of each month, commencing with the 10th day of February. According to the testimony of Essig, about the 11th or 12th of February the defendant telephoned him under the name of Brown, but subsequently disclosed his identity, and asked if the witness could come down to meet the first note; that the witness replied that he would be down within a couple of days, and on the 17th of February he drew $200 from the bank, the amount of the first note, and called upon and delivered it to the defendant, who put it in his pocket and retained it, and surrendered the note; that as each of the other notes, except the last, fell due or within a few days thereafter, he drew from the bank $250 and delivered it to the defendant and received the note which it paid. The paying teller of the bank corroborated Essig with respect to the respective transactions with the bank. The defendant denied that the notes were ever delivered to him, or that they were paid to him. He admitted, however, that Essig came to his office about four or five weeks after December 31, 1903, and testified that he did not see him again prior to the 17th day of August, 1904, but he claimed that Essig's visits on those occasions were with respect to trouble that he had about "testing" on the work and with respect to obtaining cheaper help, matters which were not within the jurisdiction of the defendant. Essig, in rebuttal, denied this testimony. The defendant's stenographer testified that she saw Essig in the defendant's office two or three times between the 1st of January and the 1st of July, 1904, at intervals of four or five weeks.

The payment of the last note was not proved by the people, but was brought out by the defense on Essig's cross-examination. In connection with this fact, the defense showed that there was a general strike in August; and that the men on the Chatsworth job went out

with others, quitting on August 16th; that shortly prior to August 16th the defendant endeavored to telephone Essig, but was unable to get into communication with him. Essig testified that on August 17th he had conversations with the owners, with an attorney named Cohn, and a representative from the district attorney's office relative to his transactions with the defendant, and was provided with $250 in bills, some of them being marked; that from the district attorney's office he telephoned to the defendant and asked "why he pulled out my men"; that defendant denied that he pulled them out, and, on being asked if he knew that they were out, said that he did, and that he was trying to get the witness on the wire a couple of days, and said, "You know what the trouble is," and the witness said, "I suppose the reason you pulled them out was because I was not down with the other money," to which the defendant answered, "Yes"; that witness then asked the defendant if he could see him; that defendant said he was awful busy, but that, if "I would come down in 10 minutes, he would give me five minutes." Essig then went down to see the defendant and the latter suggested that they go to the office of the People's Security Company (where it appears that the attorney for his union had an office), and went into a private office and had a conversation, the substance of which is that the defendant had learned that the district attorney was investigating his conduct in this matter, and that for that reason he had destroyed the last note, but he asked for the amount of it, which the witness paid over and the defendant counted, and while he was counting it the witness coughed, as a signal evidently to the detectives who were supposed to be in hearing. The testimony of Essig indicates that the defendant therefore became suspicious, for he said that he was informed that Kahn, a member of the owner corporation, had been before the district attorney, and he asked if this money which Essig gave him was Kahn's money, and thereafter left the room, asking the defendant to wait a minute, and remained absent about a minute. After the defendant returned they went downstairs and the defendant said, "You know, Essig, that under the Prince law, you are just as guilty as I am." When they reached the ground floor, the defendant was arrested by the detectives, but there is no evidence that any of the marked money was found on him. With respect to this interview, the defendant testified, in substance, that it only consisted in the discussion of the reasons for the strike in August, and he denied that there was any payment of money or that they went into any private office. The testimony of other witnesses was introduced by the defense, evidently with a view to showing that Essig's story that he and the defendant went into one of the private offices was not true. The testimony of these witnesses, however, was contradicted by their own admissions or by other evidence, and it does not appear to be convincing. The conversations had between the defendant and Johnson prior to the first strike were received under the exception and objection of the defendant that they were incompetent and immaterial. The purpose of the evidence at the time it was offered was not stated, nor was the effect of it limited by the court in its reception.

At the close of the people's case, and at the close of the evidence, counsel for defendant moved to dismiss the indictment upon the ground

that the evidence was insufficient to show the commission of the crime. The motions were denied and exceptions were duly taken. These exceptions are urged as grounds for reversal. The learned counsel for the defendant contends that the language shown to have been used by the defendant did not per se constitute a threat to do an unlawful injury to the property of Essig, or instill fear in the mind of Essig that it would be carried into execution. We are of opinion that the evidence was sufficient to show all the material elements of the crime. The facts bring the case fairly within the doctrine of People v. Barondess, 61 Hun, 571, 16 N. Y. Supp. 436, wherein the Court of Appeals affirmed the conviction upon the dissenting opinion of Justice Daniels at General Term (133 N. Y. 649, 31 N. E. 240), and within the case of People v. Hughes, 137 N. Y. 29, 32 N. E. 1105, which followed it. In the Barondess Case the defendant was president of an association of cloak operatives. The complainant was an employer of cloak operatives who had quit work, owing to a controversy over the rate of wages. As a result of negotiations, the workingmen agreed to return, but failed to do so. The complainants inquired of the defendant the reason for this, and were informed that it was because they had not settled with him, and he said to them, "You have got to pay me $500 to have your people back again to work." There, as here, the defendant finally compromised by taking less than he had first demanded. In that case the defendant represented that he controlled the employés and, the complainant testified that he believed that the defendant had power to keep the men from returning to work. It was there held that an injury to one's business is an injury to property within the provisions of the Penal Code defining the crime of extortion, and that a loss resulting from the suspension or interruption of business would constitute an injury to property. It is true that in the case at bar the defendant did not expressly represent that he controlled the striking employés, and the complainant did not expressly testify that he believed that the defendant would keep the men from returning to work, unless his demands were acceded to. The evidence, however, fairly warranted the jury in finding those facts. All known difficulties had been adjusted, and there appears to have been no reason why the men did not return to work, except the influence and control exercised over them by the defendant as president of their union. The moment his unlawful demand was complied with the men resumed work, and there was no further trouble until the complainant failed to pay the last note, and the defendant admitted, according to the testimony of Essig, that such failure was the reason for the strike at that time. The complainant testified in substance that he believed the defendant's threat to prevent the resumption of work until his extortionate demand was complied with. The defendant had shown his authority as president of the union and over members by peremptorily refusing to give the complainant a hearing before the union, when one of the delegates at least knew that the complainant was anxious to resume work and desired such hearing, with a view to presenting his grievance to the members. From the standpoint of the complainant the facts fairly justified a belief on his part that, unless he paid the money and gave the notes, the men would not be permitted by the defendant to return to work, and that the de-

fendant had sufficient influence over them to carry out his threat. All grievances having been adjusted, the threat of the defendant, in effect, to exercise his influence and control over the members of the union to prevent their returning to work on this apartment building unless the money which he wrongfully exacted was paid, constituted a threat to do an unlawful injury to the property of the complainant, calculated and sufficient to instill fear in the complainant and induce him to pay the money. There is no express evidence of the damages that would have been sustained by the complainant had he, instead of complying with the defendant's request, refused his unlawful demand, and permitted the defendant to execute his threat. The amount of damages which he would have sustained is of no consequence. It is sufficient if it appears that he would have sustained damages. It would seem that the people might have readily shown more clearly that damages would have been sustained by Essig; but we thing their failure to do so does not require a reversal. It is claimed that Essig's contract with the owners for the work, which was in writing, was not in fact what it purported to be, and that the owners were themselves to furnish the material and the complainant was merely to be paid for superintending the work. Upon either theory it is manifest that he would have sustained damages. It is not to be presumed that he would have been paid for superintending work while the work was not being done. We think it presumptively appeared that the complainant in his business, either as contractor or superintendent of building construction work, would have sustained damages had the defendant carried his unlawful threat into execution.

The court ruled that it was immaterial whether the money which Essig delivered to the defendant was his own or that of the Johnson-Kahn Company, and ruled out evidence offered by the defendant tending to show that it belonged to the company. It may be that Essig was acting as agent of the owners in receiving the money which he subsequently delivered to the defendant, because it was originally received to pay the waiting time, but it was not material from what source it was received. The defendant wrongfully exacted money, and the complainant was liable to suffer loss if he did not obtain it from some source and deliver it to the defendant. It is urged that the rulings on this subject constituted prejudicial error. According to the plain provisions of section 552 of the Penal Code, the rulings were correct. The material issue in that regard was not whose money was it, but did the defendant receive it from the complainant.

The appellant contends that it was error to receive evidence of the defendant's threat to call a strike on the building when the former contractor, Rendall, was doing the work. We are of opinion that the evidence was clearly competent upon the question of the intent of the defendant by the threat made to Essig to do an unlawful injury to his property. The defendant pleaded not guilty. It was essential for the people to prove every element of the crime, and the intent of the defendant to do an unlawful injury to the complainant's property was one of the essential elements of the crime. His former acts in relation to this contract work characterized the threat, and would tend to remove any doubt that the jurors might entertain as to his purpose of wrong-

fully inducing the men to remain out upon the strike without just cause. It is evident that he had determined to use his office as president of this union and his influence with the members to wrongfully exact a large amount of money, evidently based on a rough estimate made by himself of a percentage of the profits on the work, as a condition of allowing the members of his union to be employed by any contractor, or even by the owner in the completion of the work. It mattered not to him whether Rendall or Essig or some one else was the contractor. He had unlawful designs on the work, and proceded early in the history of the plumbing work to put his preconceived plan into execution. Since he threatened Johnson to call a strike on Rendall unless his unlawful demand was satisfied, it was a reasonable inference, in view of his threat to Essig, that he wrongfully intended to refuse to permit the men to return to work until the like demand made upon Essig was satisfied.

It is urged on the appeal that the defendant's threat to Essig was innocent, and it was doubtless so argued before the jury. The fact that the defendant had recently claimed that he had sufficient influence with his union in effect to call a strike at will, because, although there may have been good ground under the rules of the union for a strike, he assumed to be able to avert it provided he received the money which he wrongfully exacted, tended strongly to show, in connection with other evidence, that in making the threat to Essig he intended to wrongfully exert his influence with the journeymen plumbers to induce them to refuse to return to work until he gave his consent, or to wrongfully exercise his authority as president in withholding such consent. Doubtless the members of the union misjudged the defendant, for they appear to have placed implicit confidence in him and to have submitted blindly to his rule. Upon receiving the money and notes, the defendant promised, in effect, that the men should return to work; and it is evident that the order for their return emanated from him, for there is no other explanation consistent with the testimony of Essig which the jury doubtless believed of how they came to return to work. The evidence of the prior attempt, therefore, shed light on the motive and intent of the defendant in making the threat to Essig, and indicated a preconcerted plan on his part to prevent the performance of this contract work, unless he should, without right or authority, receive a large percentage of the profits to be arbitrarily and wrongfully exacted, and, being closely connected in time and similarity of circumstances, it was competent both upon the question of motive and intent and as showing the successive steps in a preconceived plan which culminated in the crime for which the defendant has been convicted. People v. Sharp, 107 N. Y. 467, 14 N. E. 319, 1 Am. St. Rep. 851; People v. Shea, 147 N. Y. 99, 41 N. E. 505; People v. Zucker, 20 App. Div. 363, 46 N. Y. Supp. 766, affirmed on opinion of Patterson, J., 154 N. Y. 770, 49 N. E. 1102; People v. Molineux, 168 N. Y. 264, 305, 61 N. E. 286, 62 L. R. A. 193. On the trial of an indictment for uttering forged paper, where the real issue was as to whether the defendant knew that it was forged, it has been held competent to show the utterance of other forged paper by him under similar circumstances and about the same period of time, upon the theory that such proof established a common

plan and identity of method so connected as tends strongly to overcome any claim of innocence in uttering the forged paper for which the indictment was found. People v. Dolan, 186 N. Y. 4, 78 N. E. 569. In People v. Putnam, 90 App. Div. 125, 85 N. Y. Supp. 1056, affirmed on opinion below, 179 N. Y. 518, 71 N. E. 1135, which was one of the so-called "Sick Engineer Cases," this court said:

"It is well settled that in cases of this kind, where the fraudulent intent is an element of the crime, similar frauds of the same character and closely connected in point of time are competent evidence to show the intent with which the crime was committed; and the mere fact that they tend to prove an independent crime does not render such evidence incompetent. It is competent to show the criminal intent of the parties directly connected with the transaction, which is necessary to constitute the crime."

In People v. Van Tassel, 26 App. Div. 445, 50 N. Y. Supp. 53, affirmed 156 N. Y. 561, 51 N. E. 274, where there was a joint indictment for subornation of perjury, it was held, on a separate trial of one of the defendants, that evidence that they had endeavored to induce other witnesses to testify falsely upon the same trial was competent as tending to show motive and intent, and as relating to the same transaction and as done for the same purpose. In People v. Doty, 175 N. Y. 164, 67 N. E. 303, on the trial of an indictment for feloniously receiving stolen property, it was held that evidence that the defendant had previously received property stolen by the same thieves, but from other owners, was admissible on the question of guilty knowledge of the defendant.

At the close of the main charge the court was requested to instruct the jury that:

"The jury cannot consider the statement of the witness, George Johnson, that the defendant asked him for $3,000, as corroborative of the testimony of Essig that the defendant asked Essig for a sum of money."

The court declined to charge "in the language requested." Counsel for the defendant excepted, and assigns this exception as ground for reversal. Neither in the offer nor in the reception of the testimony of Johnson was its application limited, nor was there a request or even suggestion on the part of the defendant that it be limited. No specific reference was made to it in the charge, and the jury were not instructed with respect to its application. It is contended that the request which was refused was, in effect, a request to limit the application of that testimony. The only theory upon which this request to charge could be proper would be that the evidence when received should have been limited to the question of motive and intent. If counsel for the defendant was of the opinion that it should have been so limited, he should, either at the time the evidence was received or before or after the court instructed the jury, have pointedly drawn the attention of the court to that proposition. This, however, he failed to do. It was not proper to seek to have testimony thus received generally without any suggestion that its effect should be limited by picking out the testimony of a particular witness and requesting the court to instruct the jury that it could not be considered as corroborative thereof. The court subsequently charged, at the request of counsel for the defendant:

"That there is no direct testimony by any witness besides Essig to corroborate the statement of Essig that he was asked for any sum of money by Weinseimer December 31, 1903."

The jurors doubtless understood from this instruction that the testimony of Essig was not corroborated by the testimony of any other witness. It is reasonable to infer that such was the object of the request, since, as no other witness testified to having overheard the conversations between Essig and the defendant, the request could have served no other purpose. We are of opinion, however, that the instructions given on this subject were more favorable to the defendant than the law required, and our opinion has already been briefly expressed. Ordinarily such evidence is competent only on the question of motive and intent, but here the evidence was competent generally as tending to show a previously conceived plan and determination on the part of the defendant to commit the crime of which he has been found guilty. Perhaps, owing to the fact that his former threat was to Johnson and before Essig became the contractor, the evidence may not have been strictly admissible as tending to show a previous attempt to commit the same crime, which would render it competent generally (People v. O'Sullivan, 104 N. Y. 481, 10 N. E. 880, 58 Am. Rep. 530; People v. Wagner, 180 N. Y. 58, 72 N. E. 577), because the crime as finally committed consisted in extorting the money from the succeeding contractor; but it is improbable that the personnel of the contractor figured in the defendant's mind, and it is to all intents and purposes, except as to the individual who happened to have charge of the work as contractor at a particular time and whose individuality did not enter into the consideration, an attempt to commit the same crime. Since it has been settled that a prior attempt to burn the same building or rape the same female is competent generally as tending to show a preconceived plan and purpose to commit the crime, which, of course, would be corroborative of evidence that it was subsequently committed, it would seem to follow logically that a prior attempt or threat to burn the same barn or to steal the same property, as, for instance, a particular horse, would be competent even though ownership had changed in the interim. So here I think where it is quite clear that the purpose and plan were directed not toward the individual, but toward the contract work, evidence of a prior attempt by the defendant to extort money either from the owner or from a former contractor so closely connected in time and similarity of circumstances as to indicate that the former wrongful demands and threat constituted a step in the preconceived plan and purpose which culminated in this crime, even though at the outset it could not have been known that Essig would be the contractor to be ultimately held up if the plan should not be successfully consummated sooner. His mind was upon this work and his plan and purpose was to unlawfully obtain some money from whoever did it as a condition of permitting it to be done by the members of his union. His previous threat was with respect to the same work, not remote in time from the threat to Essig, and the evidence indicates and warranted a finding that there was no change in plan and purpose from the outset, and that there was a continuity of conduct on his part indicating a deliberate design and determination to unlawfully obtain money as a condition of permitting

this work to be done, which he finally consummated by exacting it from Essig. Within the authorities already cited, and particularly within the case of People v. Zucker, supra, where proof of the commission of another similar crime by the defendant was admitted and submitted to the jury as evidence corroborating the complaining witness, who was an accomplice, this evidence might have been properly considered by the jury as corroborating the testimony of Essig. Notwithstanding the denial of guilt on the part of the defendant, we are convinced by an examination of the testimony that the facts and circumstances proved clearly established his guilt beyond a reasonable doubt. We have examined the other exceptions, and find no error which demands a reversal of the conviction or requires extended consideration. By section 542 of the Code of Criminal Procedure the Legislature has commanded that:

"After hearing the appeal, the court must give judgment without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties."

That command should not be lost sight of in any criminal case, and particularly in the case of a crime like this, which is a special menace to the public welfare. All controversies between capital and labor resulting in a strike injuriously affect more or less the entire community. They are sufficiently disastrous and deplorable when they result from an honest difference of opinion between the employer and the employed; but when, as here, the strike is protracted long after all grievances have been adjusted, by an officer of a labor union who betrays his trust to the fellow members of his union, and in effect deprives them of their rights to work until he has unlawfully extorted money from their employer for his own ends, the crime is intolerable from any point of view, and should be speedily and severely punished.

It follows that the judgment should be affirmed. All concur.