**UNITED STATES of America**
**v.**
**John J. SWEENEY, Appellant.**
**No. 12549.**

United States Court of Appeals
Third Circuit.

Argued Nov. 3, 1958.

Decided Jan. 8, 1959.

---

2. Now 50 U.S.C.A.Appendix, § 451 et seq.

Alexander Cooper, Marjorie Hanson Matson, Pittsburgh, Pa. (Murray Love, Pittsburgh, Pa., on the brief), for appellant.

Thomas J. Shannon, Asst. U. S. Atty., Pittsburgh, Pa. (Hubert I. Teitelbaum, U. S. Atty., Pittsburgh, Pa., on the brief), for appellee.

Before MARIS, GOODRICH and KALODNER, Circuit Judges.

GOODRICH, Circuit Judge.

This is an appeal from a conviction under the Hobbs Act, 18 U.S.C. § 1951 (1951). There were two counts, both charging extortion; defendant was found guilty on both. There is no unsolved problem with regard to interstate commerce for the companies against whom the extortion was found to have been practiced are engaged in interstate trucking.

The statute makes it an offense to obstruct, delay or affect commerce by "robbery or extortion". 18 U.S.C. § 1951(a). Extortion is then defined as "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear * * *." 18 U.S.C. § 1951(b) (2). Defendant says that the facts presented do not establish a violation of the statute. Taking a view of the evidence most favorable to the Government, as we must

at this stage,[1] we cannot accept this argument.

The defendant, John Sweeney, was a steward in Local 249 of the General Teamsters, Chauffeurs and Helpers Union (Teamsters). A man named Stanley Wray was employed in Pittsburgh to head up the Pittsburgh business of a trucking concern called W. H. Johns Company. For some time Wray had done similar work for the Hirt Trucking Company. Wray, during part of the time here in question, was a member of Teamsters but not Local 249 which operated in and about Pittsburgh.

From time to time prior to October 10, 1955, the defendant had made statements to Wray demanding that he use union "city men" to unload the trucks the employer companies brought into Pittsburgh. He threatened Wray with violent consequences to himself and the trucks if the demand was not complied with. On October 10, 1955, following a demand from Sweeney that Wray attend a meeting at the union hall, Wray went, accompanied by a man named Lombardo, General Traffic Manager of Johns Trucks and the company lawyer. During this meeting the defendant entered and threatened to kill Wray but evidently took no steps to accomplish this end. This meeting adjourned without anything being settled. But later in the day, at a meeting at a Pittsburgh hotel, Mr. Livengood, representing the Johns Company, and Messrs. Kegel, Fagan and Garfold, representing the Union, reached an agreement regarding the unloading of the trucks brought into the Pittsburgh area. By this agreement Wray was to become a member of the local union and the terms of the regional contract affecting employers and truck drivers were to be followed.

The critical point in the chronology comes next. At the conclusion of the satisfactorily ended conference at the hotel, Wray, counsellor Livengood and others went to the lot where Johns and

1. Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Nedley, 3 Cir., 1958, 255 F.2d 350, 352.

Hirt trucks came and went. Exit from the lot was blocked and Sweeney was there. According to the testimony Sweeney substituted conditions of his making for those which had been reached at the conference. The conditions thus imposed were more onerous to the employer. Sweeney selected the man who was to do the unloading. Instead of paying him at the rate of $17.80 a day as agreed at the conference he was to be paid $17.80 for every truck wholly or partially unloaded. There was also evidence of payment to a welfare fund by which Sweeney imposed more expensive terms on management than the conference had agreed upon.

The testimony shows a long series of threats of violence by Sweeney prior to the ultimatum thus described. It also shows a series of violent acts by Sweeney in forcing his version of the terms imposed. Thus, when the man Sweeney selected to do the unloading was not available (one George Nicholas), Sweeney insisted that Nicholas be paid and used violence and threats of violence on the union member chosen as an alternate to Nicholas.

■ This evidence shows sufficiently an extortion of money from employers Hirt and Johns and it shows the extortion established both by violence and threats of violence. 18 U.S.C. § 1951(b) (2) (1951). The violence was directed to Wray and other trucking employees. The payments resulted from threats of violence. Payment, induced solely by wrongful use of fear of economic loss, is sufficient under the statute. Bianchi v. United States, 8 Cir., 1955, 219 F.2d 182, 194; United States v. Stirone, 3 Cir., 1958, 262 F.2d 571. Here, there was

fear not only of economic loss but of physical injury as well.

■■ It is not charged that Sweeney got the money paid by the trucking companies in the way just described. But it is settled under the statute that the offense is committed even though the person doing the extorting does not get the money. United States v. Green, 1956, 350 U.S. 415, 418–420, 76 S.Ct. 522, 100 L.Ed. 494; United States v. Kemble, 3 Cir., 1952, 198 F.2d 889, 890. The conclusion on this branch of the case is that there is sufficient evidence to make out a case of extortion under the statute.

■ The appellant raises the question of the sufficiency of the judge's charge on the subject of intent. It is to be noted that at the end of the trial and as the case was about to be submitted to the jury, the trial judge asked counsel for each side if there was anything more either wanted added to the charge. The trial counsel for the defendant categorically stated that there was not. The point, therefore, is not open, unless the omission is so serious as to produce an unjust result.[2]

■ But inasmuch as this case must be reversed for a new trial for the reasons stated below, it is not necessary to rule on this point. On retrial the court, in charging the jury on extortion, should, when covering the element of intent, keep in mind the opinions of this Court in United States v. Kemble, 1952, 197 F.2d 316, 320–321, and United States v. Nedley, 1958, 255 F.2d 350. Both cases involved larceny-type offenses, of which extortion as defined in the Hobbs Act is one.[3] See also Morissette v. United States, 1952, 342 U.S. 246, 72 S. Ct. 240, 96 L.Ed. 288.

---

2. Fed.R.Crim.P. 30, 52(b), 18 U.S.C.

3. Nedley carefully points out that the definition of the substantive offenses under the Hobbs Act were derived from the New York Code, N.Y.Penal Law, McKinney's Consol.Laws, c. 40, § 850. 255 F. 2d at page 355. In the House debate on the bill, Representative Hobbs, its sponsor, stated that "the definitions in

this bill are copied from the New York Code substantially." 91 Cong.Rec. 11900 (1945). Under the New York definition of extortion criminal intent was, at the time of its incorporation into the federal statute, an essential element of the crime. See e. g., People v. Weinseimer, 1st Dept., 117 App.Div. 603, 102 N.Y. S. 579, 588, affirmed without opinion 1907, 190 N.Y. 537, 83 N.E. 1129.

■ It is suggested, although not clearly argued by the defendant, that Sweeney's conduct here was not forbidden by the act because it is exempt as lawful labor activity.[4] We need not decide in this case how far concerted employee activity through a union, accompanied by violence or threats thereof, is exempted from the act. The reason we do not need to meet this question is that here we do not find evidence in Sweeney's conduct of union activity. The conference at the Pittsburgh hotel, above described, was conducted by representatives of the union and representatives of the employer. An agreement was reached. There was, so far as we know, no violence nor threats of violence at that amicable meeting. The activities of Sweeney seem to have been self-prompted according to the testimony. He ignored the agreement reached and forced another one by violence on the employer. Sweeney was not the head of the union, he was merely a steward and so far as the record shows had no authority whatever in any part of the process of bargaining between the union and management.

Now we come to the part of the case which concerns the necessity of reversal and the grant of a new trial.

■ It has already been stated that many instances of violence and threats of violence on the part of the defendant against employees of Johns and Hirt were shown by the testimony. Violence and threats of violence known to the company officials took place before the occurrences of October 10th. Violence on Sweeney's part took place after October 10th. Evidence of these acts was relevant to the establishment of extortion by the defendant, as bearing on whether consent was induced by fear.

At the trial the defendant took the stand. He denied many or all of the episodes charged against him. On cross-examination he was asked whether he had ever used force or violence on any truck drivers. He answered that he did not recall specific instances but imagined that he had had his fair share. Then he was asked whether he knew of a Mr. Huffman, a Mr. Strunk and a Mr. Wilson or could recall incidents involving them. He said he did not know them nor could he recall any incidents suggested by the question.

Then in rebuttal the Government called these three men. Strunk said that Sweeney struck him on a day named with what might have been a tire iron. Huffman said that he and Sweeney had had a fight at a picnic. Wilson related an incident where Sweeney had called him names and had threatened to hit him.

These three men had nothing to do with the companies involved in Sweeney's alleged extortion. Their evidence was logically relevant to show that Sweeney lied about his acquaintance with them and hence was a person unworthy of belief. But whether Sweeney was involved in the incidents related by these witnesses was purely collateral to the main question of Sweeney's guilt or innocence of the extortion charge. It is true, without doubt, that a witness may be severely cross-examined in an effort to determine whether he is telling the truth. McCormick, Evidence, §§ 19–20, 22 (1954); 3 Wigmore, Evidence § 944 (3d ed. 1940). It is likewise true, as we have said, that when a defendant in

---

4. The exemption of certain labor union activities from the coverage of the act can be found in two places. Section 1951 (c) states that "this section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45." The references are to the exemption of labor organizations from the anti-trust laws, a restriction of injunctive relief against labor unions, the Norris-LaGuardia Act, the National Labor Relations Act and the Railway Labor Act respectively. In addition, section 1951(b) (2) defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear * * *." The effect of the statute on labor union activity is discussed in United States v. Kemble, 3 Cir., 1952, 198 F.2d 889.

a criminal case takes the stand he may be cross-examined as any other witness may be. United States v. Lowe, 3 Cir., 1956, 234 F.2d 919, 922. 3 Wigmore, § 890. But it is also an established general rule that when a witness is cross-examined for the purpose of discrediting his veracity by proof of specific acts of misconduct not the subject of a conviction, the examiner must take his answer as it is given and is not free to bring in independent proof to show that the answer was untrue. McCormick § 42 at n. 21; 3 Wigmore §§ 977, 979.

The purpose of the rule cutting off rebuttal testimony on this type of cross-examination is to avoid a confusion of issues or undue prejudice to the defendant. While the scope of the cross-examination of the witness concerning prior misconduct not the subject of conviction is, in its administration, within the sound discretion of the trial judge, the same principle is not applicable to rebuttal testimony which is inadmissible.[5] United States v. Klass, 3 Cir., 1948, 166 F.2d 373, 376; United States v. Sager, 2 Cir., 1931, 49 F.2d 725, 730.

Further, the rule which prohibits the showing of other crimes is for the protection of a defendant. It is, as we say elsewhere,[6] easy to slip from the trial of a man for a particular offense to the trial of his character generally. If the testimony of other offenses does no more than show propensity to commit a given crime it is error to admit it. This point was discussed in United States v. Stirone, and that discussion need not be repeated here.[7]

The trouble in this case is that the rebuttal testimony, while tending to prove that Sweeney lied, also tended to show that he was a bad man full of violent deeds. It came at the very close of the case. It was not limited by the trial court's charge in any way, assuming that such a limitation would have saved it. Sweeney may well be an overbearing citizen with a short temper. But if he is to be convicted under the Hobbs Act it must be for offenses under that Act, not because of his general propensity to commit assault and battery. With regret we think that the error in the admission of this testimony was so highly prejudicial that we must reverse the judgment and remand the case for a new trial.

KALODNER, Circuit Judge (concurring).

I am in accord with the majority's disposition. I would also reverse on the ground that the failure of the trial judge to give adequate instructions to the jury on the score of "intent" (he gave none) constituted basic and prejudicial error.

---

5. Whether reversible error depends on whether the admission of the testimony is prejudicial. Fed.R.Crim.P. 52(a).

6. United States v. Stirone, 3 Cir., 1958, 262 F.2d 571.

7. Ibid. See Stone, The Rule of Exclusion of Similar Fact Evidence: America, 51 Harv.L.Rev. 988 (1938).