UNITED STATES of America

v.

Keith FARRIES et al.

Crim. No. 14770.

United States District Court,
M. D. Pennsylvania.

June 24, 1971.

Keith Quigley, Lemoyne, Pa., for defendant Keith Farries.

James Rowland, Jr., Harrisburg, Pa., for defendant Billy H. Boulware.

Carl B. Stoner, Jr., Harrisburg, Pa., for defendant Alexander Tisdale.

William H. Nast, Jr., Harrisburg, Pa., for defendant Stephen W. Ferguson.

Gilbert E. Petrina, Harrisburg, Pa., for defendant Kenneth Swanson.

Alfred Hantman, Gregory Jones, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for United States.

## OPINION

MUIR, District Judge.

Following a six-week jury trial, Keith Farries, Billy H. Boulware, Alexander Tisdale, Stephen W. Ferguson, and Kenneth Swanson were convicted of mutiny and riot at the United States Penitentiary, Lewisburg, Pennsylvania, in violation of 18 U.S.C. § 1792. The defendants were also convicted on individual counts of assault on federal officers with and without dangerous weapons in violation of 18 U.S.C. § 111. Before the Court are motions for a new trial. The twenty issues presented in these motions will be discussed *seriatim.*

### 1. WERE THE DEFENDANTS ENTITLED TO A PRELIMINARY HEARING?

■ It is defendants' position that by electing to proceed by indictment rather than by information, the government circumvented the requirements of due process of law and Rule 5 of the Federal Rules of Criminal Procedure.

United States v. Conway, 415 F.2d 158 (3d Cir. 1969) is controlling. There the Court ruled that the purpose of a preliminary hearing is to afford an arrested person a prompt determination of whether or not there is probable cause to hold him for grand jury action. The Court specifically held that an intervening indictment renders such a hearing unnecessary. Accordingly, it is my view that defendants' rights were in no way violated by the government's choice of procedure.

### 2. WERE THE DEFENDANTS ENTITLED TO A CHANGE OF VENUE OR REMOVAL OF THE TRIAL FROM LEWISBURG TO ANOTHER PLACE IN THE DISTRICT?

■ Rule 21, Fed.R.Crim.P., provides for a change of venue if the defendant can show that he cannot obtain a fair trial at any place fixed by law for holding court in the district. Rule 18 impliedly allows for a transfer within the district. It is settled that motions under the Rules are addressed to the sound discretion of the trial judge.

Defendants are Black Muslims. They argued that their religious beliefs precluded their obtaining a fair trial in Lewisburg. Thus, it was argued that since there were no adherents of the Black Muslim faith in this area, the particular problems and views of this group could not be objectively evaluated. Additionally, it was argued that since the United States Penitentiary was a key economic factor in the area, an impartial jury could not be impaneled.

■ The ultimate question is whether it was possible in Lewisburg to select a fair and impartial jury. Blumenfield v. United States, 284 F.2d 46, 51 (8th Cir. 1960). The time for determination of this question is upon the *voir dire* examination. The record in this case will reflect that (1) an extensive and comprehensive examination was made of each individual member of the panel by the Court; (2) few of the prospective jurors had any prior knowledge of the case; (3) the Court allowed the defense great latitude with respect to its challenges for cause when a prospective juror was in any way connected with the United States Penitentiary, and (4) the Court permitted the defense a number of peremptory challenges unparalleled in this district. While counsel at argument talked in terms of a "feeling of prejudice", the records clearly indicate that no actual prejudice existed.

### 3. WERE THE DEFENDANTS ENTITLED TO INSPECT AND COPY THE GRAND JURY MINUTES?

■ The defendants' request prior to trial for the minutes of all testimony presented to the Grand Jury was denied. However, government counsel delivered to each defense attorney the grand jury testimony of every witness who testified during the trial, in compliance with 18 U.S.C. § 3500, as amended on October 15, 1970. We perceive the law to require no more. Dennis v. United States, 384 U.S. 855, 868–875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

4. WERE THE DEFENDANTS ENTITLED TO A LIST OF THE GOVERNMENT'S EXPERT AND LAY WITNESSES?

■ 18 U.S.C. § 3432 provides that in cases where a defendant is charged with treason or other capital offense, the government shall provide the defense with a list of the witnesses it intends to call. Such a list need not be produced in non-capital cases. United States v. Margeson, 261 F.Supp. 628 (E.D.Pa.1966). See United States v. Persico, 425 F.2d 1375 (2d Cir. 1970) and the cases cited therein.

5. DID THE COURT ERR IN DENYING DEFENDANTS' MOTIONS FOR A BILL OF PARTICULARS?

■ A defendant is entitled to a bill of particulars only if it appears that the indictment does not inform him with sufficient particularity of the charges against which he will have to defend at trial. Rule 7(f), Fed.R.Crim.P. As I see it, an indictment must be so worded as to allow a defendant to ascertain the time and place of commission of the acts complained of and, when relevant, the identity of the person, or persons against whom such acts were committed. 8 Moore's Federal Practice ¶ 7.06(2). An examination of the indictment in the instant case reveals that it met these requirements. Defendants therefore did not need any further information respecting the charges in order to prepare a defense.

6. WERE THE DEFENDANTS ENTITLED TO BE PLACED IN GENERAL PRISON POPULATION PRIOR TO AND DURING THE TRIAL TO AID IN THEIR DEFENSE?

■ This problem was one of the thorniest raised during the course of the litigation. The defendants have been housed in the segregation unit of the penitentiary since the date of the riot. They argued that in order to assist their attorneys to prepare for trial, it was necessary for defendants to be returned to the general population. Their reasons were forceful. They contended that many of the witnesses they believed could give favorable testimony were known to them only by nicknames and a list of real names of prisoners was of little value. The defendants further argued that their attorneys would not be able effectively to interview those inmates whose identities were known since there is a general distrust among the prison population towards outsiders.

On the other hand, the government urged that prison discipline and morale could not have been maintained if these defendants were released to the population. The riot of February 1, 1970 was the first riot in the 38 year history of the institution. Eight correctional officers were injured, three critically, one of whom has not recovered and will never recover.

Taking all factors into consideration the court devised a plan which, in my view, accommodated all concerned. On successive days, the defendants in groups of three were permitted to observe all of the inmates as they stood in the chow line. At these sessions, the defendants were permitted to point to those individuals whom they believed would or could help them. The guards then took the individuals' names, and subsequently, the defendants and their attorneys were given the opportunity to interview these persons. Additionally, announcements were made periodically over the prison public address system to the effect that any prisoners wishing to communicate with defense counsel should write directly to defense counsel, seal the envelope and mail it in a larger envelope addressed to the Court, or write directly to the Court. The latter transmitted all correspondence thus received to defense counsel. Since mail directed to the Court is not censored, the objection that official reprisals would be taken against those aiding the defense was eliminated.

I believe that these two measures eliminated any prejudice flowing to the

defendants from their incarceration in segregation. Accordingly, there is no merit to this contention.

### 7. WERE THE DEFENDANTS ENTITLED TO A CONTINUANCE?

■ By his order dated December 10, 1970, the Honorable R. Dixon Herman granted defense requests for a list of all inmates residing at the federal penitentiary on February 1, 1970, and a list of the names of those inmates who had been residing at the Lewisburg institution on that date who were subsequently transferred to other institutions. The former list was turned over in December of 1970. However, the latter was not received by defense counsel until January 13, 1971, five days before trial. In urging the Court to grant a continuance, defense counsel argued that they had not had ample time to confer with their clients in order to determine the names of the transferees who should be interviewed as potential witnesses.

The trial of this case began on January 18, 1971. The government's case in chief terminated on February 10, 1971. During this period, the Court authorized the production by the United States Marshal of thirty-eight witnesses for the defense. Many of these were inmates at other federal penal institutions.

It is worth noting that in denying the motion for a continuance, the Court was also motivated in part by concern for the welfare of the defendants. As was pointed out earlier, the defendants have been housed in the segregation unit of the penitentiary from February 1, 1970. The correspondence received from the defendants indicated that these men wished to obtain as expeditious a determination of the charges against them as was possible. Under the circumstances, the motion denying the continuance was justified.

### 8. WAS DEFENDANT SWANSON ENTITLED TO WAIVE A JURY TRIAL?

■ Prior to the trial of this case, defendant Swanson moved under Rule 23(a) Fed.R.Crim.P. to be tried without a jury. The government opposed this motion. Counsel were agreed that Singer v. United States, 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965) provided the applicable principles relative to the motion. In sustaining the validity of Rule 23(a), the Court said, "* * * We find no constitutional impediment to conditioning a waiver of this right on the consent of the prosecuting attorney and the trial judge when, if either refuses to consent, the result is simply that the defendant is subject to an impartial trial by jury—the very thing that the Constitution guarantees him". The Court, however, indicated that some circumstances might arise where the government's insistence on a trial by jury would deprive a defendant of an impartial trial. Defendant Swanson argued that such circumstances existed in this case since a jury would know from the outset of the trial that he was an inmate of a federal penitentiary at the time of the alleged offense. It is his contention that a jury could not have eliminated this knowledge from their minds and rendered an impartial verdict. The knowledge that the defendant was an inmate cannot in my view be deemed to be so compelling as to preclude a fair trial by jury. As previously pointed out, this Court went to great lengths to assure the impanelling of a jury that would render a fair and impartial verdict. This fact and the instructions of the Court dispel any notion to the effect that the jury obtained in this case was biased. Defendant Swanson's motion was properly denied.

### 9. WAS THE DEFENDANT SWANSON ENTITLED TO A DISMISSAL OF COUNT 21 OF THE INDICTMENT?

■ Count 20 of the indictment in this case charged the defendant Swanson with assaulting Correctional Officer Hargraves with a dangerous weapon, that is, a telephone. Count 21 charged Swanson with assaulting Hargraves with a shod foot. It is Swanson's posi-

tion that even though different weapons were used, and more than a single blow struck, only a single offense can be charged since the assault was continuous. Ladner v. United States, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) is cited as authority. In *Ladner*, the defendant was charged in two counts of assaulting two federal officers. Consecutive ten-year sentences were imposed. The evidence showed that the defendant had fired one discharge from a shotgun which wounded the two federal officers. The Court ruled that where a single act of assault affects more than one person, only one offense is committed under 18 U.S.C. § 111.

The facts in the instant case present the converse. The evidence here shows that Swanson struck Officer Hargraves in the head with a telephone, knocking him to the floor. Swanson then proceeded to kick the fallen officer in the head. Unlike *Ladner*, there were two separate assaults directed toward the same individual. Proof of one was not proof of the other. Therefore, it was proper for the government to charge the defendant in separate counts.

### 10. DID THE COURT ERR IN DENYING DEFENDANTS' MOTION FOR MISTRIAL MADE DURING THE SELECTION OF THE PETIT JURY?

 During the course of the *voir dire* examination, a potential alternate juror indicated in response to a question concerning his knowledge, if any, of the case that his wife had informed him that one of the defendants had pleaded guilty. His answer obviously apprised the entire panel of this fact. Counsel for the defense moved for a mistrial which was denied.

In United States v. Restaino, 369 F.2d 544 (3d Cir. 1966), the Court ruled that unless undue emphasis is placed upon

the fact that such pleas have been made, it is not error for a jury to have knowledge of the fact. The Court, however, recommended that cautionary instructions be given.

In compliance, an instruction modeled on that set forth in footnote three of the Court of Appeals decision was given the jury at the beginning of the case,[1] as well as in the general charge delivered at the close.

### 11. DID THE COURT COMMIT PREJUDICIAL ERROR IN ADMONISHING DEFENSE COUNSEL IN THE PRESENCE OF THE JURY?

 At argument on these motions, counsel pointed to a single incident involving Mr. Nast in support of this contention. The colloquy between the Court and Mr. Nast occurred during the cross-examination of Officer Fromm.[2] Mr. Nast objected to the witness using a prior statement during his examination. The Court observed Fromm turn the statement face down and so stated to counsel. Mr. Nast challenged this statement of the Court, whereupon the Court, believing its integrity impugned, directed counsel to report to the judge's office following adjournment. A side bar conference followed at which several defense attorneys claimed that while the court was observing the witness, the paper was face down, but when the Court turned toward Mr. Nast, the witness turned the paper face up. This turning of the paper was never observed by the Court, government counsel, certain defense counsel, and court personnel. However, it appearing to the Court that there was a possibility that the witness had turned the paper face up when the Court had looked at counsel and that Mr. Nast had been misjudged, the Court stated to the jury that the Court might have been mistaken and directed it to

---

1. See Volume IV of the Transcript of Testimony, page 41.

2. This testimony is not as yet transcribed on the date of filing this opinion. The

incident occurred February 4, 1971, and can be found on appeal by date.

disregard the remark made to Mr. Nast by the judge. How the defendants could have been treated more fairly under the circumstances is difficult to imagine. Certainly it is clear that the admonition, if indeed it be considered as such, did not reflect on the merits of the defense, nor was it of such a nature as to prejudice the jury or unduly hamper the attorney involved. Johnson v. United States, 356 F.2d 680 (8th Cir. 1966).

12. WAS IT PROPER FOR THE COURT TO ALLOW THE IN COURT IDENTIFICATION OF THE DEFENDANTS BY WITNESSES WHO HAD MADE OUT OF COURT IDENTIFICATIONS FROM PHOTOGRAPHS?

▆ Defense counsel have not asserted any specifics with respect to this issue. Without the benefit of written or oral reasons to support the contention, it is difficult for the court to ascertain what counsel mean. During the trial several inmate witnesses did state that they had identified one or more of the defendants from a group of photographs shown them by the F.B.I. after the riot. In Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), the Court refused to prohibit the use of photographs as an investigative technique. The Court instead held that "* * * each case must be considered on its own facts, and that convictions based on eyewitness identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

In this case, the photographs were shown witnesses who already knew the defendants or had seen them on prior occasions. In many cases, therefore, the pictures only served to provide the witness with the name of an individual he had previously known at the penitentiary. Furthermore, no evidence was adduced by defense counsel on cross-examination which would in any way lead this Court to the conclusion that the circumstances surrounding the photographic identification were unduly suggestive. There is no merit to the contention.

13. WERE THE PHOTOGRAPHS ADMITTED INTO EVIDENCE UNDULY INFLAMMATORY?

▆ Government exhibits 4, 5, and 6 were color photographs showing the injuries of Officers Fromm and Haas who were victims of the assaults committed by the defendants. Exhibits 7, 8, and 9 were black and white photographs showing the injuries of Officers Treon and Kerstetter who were also injured during the riot. The defendants objected on the grounds that the pictures were inflammatory.

In overruling these objections, the Court concluded that the photographs were probative with respect to the individual assaults as well as the riot and mutiny in general, and that this value outweighed any prejudice that their admission might cause to the defendants. It is well settled that where such a determination is fairly made by the trial judge, photographs are admissible into evidence. United States v. Cartano, 420 F.2d 362 (1st Cir. 1970), cert. denied 397 U.S. 1054, 90 S.Ct. 1398, 25 L.Ed.2d 671 (1970).

14. WAS THE ADMISSION INTO EVIDENCE OF THE TELEPHONE ALLEGEDLY USED BY THE DEFENDANT SWANSON IN ASSAULTING OFFICER HARGRAVES PREJUDICIAL?

▆ Government exhibit number 2 was the telephone allegedly used by the defendant Swanson in committing the offense charged in Count 20 of the indictment. Swanson argues that its admission into evidence was error.

There was substantial eyewitness testimony to the effect that during the riot, Swanson had ripped a telephone from a desk and had struck Officer Hargraves in the head with it. It can hardly be said that the phone identified as possibly being the same as was used in

**1042**

the commission of the offense is too prejudicial to be considered by the jury. United States v. Johnson, 401 F.2d 746, 748 (2d Cir. 1968).

### 15, 16. WAS CROSS-EXAMINATION BY GOVERNMENT COUNSEL BEYOND REASONABLE LIMITS?

■ The defendants contend that the cross-examination by government counsel of the defense witnesses Boutin and Powell exceeded permissible limits.

In his examination of Boutin, government counsel asked the witness whether or not he was at that time an escapee from a Vermont mental institution. The witness responded in the affirmative. No further questions along this line were asked. Defense counsel moved for a mistrial which was denied.

The applicable principle was stated in United States v. Sweeney, 262 F.2d 272, 276 (3d Cir. 1959). The Court ruled that, generally, a witness may be cross-examined as to specific acts of misconduct, not the subject of a conviction, for the purpose of discrediting his veracity. However, the Court held that the examiner is bound by the answer he receives and is not permitted to bring in independent proof to disprove the answer.

With respect to Boutin, government counsel was within the limits set out in *Sweeney*.

The defense argument concerning the cross-examination of Jerome Powell is perplexing.

During the government's case in chief, testimony was given which pointed to Powell's participation in the riot. Accordingly, when he was called as a witness, this Court appointed counsel to advise him as to his rights. Out of the hearing of the jury, the substance of Powell's proposed testimony was ascertained. Furthermore, the scope and nature of the cross-examination was developed. The witness upon advice of counsel indicated that he would invoke his Fifth Amendment privilege and refuse to answer the majority of government counsel's questions. Government counsel moved to have the witness disqualified. The Court denied the motion. Government counsel then stated that if the witness persisted in refusing to answer his questions when the jury returned, he would move to strike the entire testimony of the witness. No objection was made.

In the presence of the jury, Powell refused to answer government counsel's questions concerning his possible implication in the events of February 1, 1970. The motion to strike was made and denied. Additionally, the jury at that point was instructed that the witness had a perfect right to invoke his Fifth Amendment privilege and that no adverse inference could or should be drawn from his refusal to answer.

■ Apparently defense counsel believe that the motion to strike the testimony was improper and prejudicial. I cannot agree. The defense received the benefit of Powell's direct testimony as well as a cautionary instruction concerning the invocation of the Fifth Amendment privilege by the witness. Since the defense was put on notice that the government would proceed exactly as it did, I cannot see how a complaint can be raised at this time.

### 18, 19. DID THE COURT ERR IN REFUSING DEFENDANTS' POINTS FOR CHARGE?

■ With one exception, the defendants have not indicated specifically what points for charge were erroneously decided. Suffice it to say that Court spent many hours reviewing the points submitted by counsel and in preparing the charge. It is my view that as a matter of law, the charge was correct and eminently fair to the defendants. The one point raised in the brief and at argument is the refusal to give a cautionary instruction with respect to the photographs introduced into evidence by the government. Defense counsel desired that the jury be instructed that they should not consider the photo-

graphs as evidence against defendants not charged with assaulting the particular individual shown in the photograph. The photographs, in my view, were probative of the riot and mutiny as to all the defendants and were probative of assault on the officer as to the particular defendant charged with the assault.

In both the preliminary and final charge, the Court instructed the jury that it was their duty to give separate and personal consideration to the case of each individual defendant. Furthermore, the jury was told that in doing so, they should analyze what the evidence in the case showed with respect to each individual, leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants.

The rejected point which is the substance of this issue was submitted and strongly argued by the defendant Cary Day who was acquitted by the jury.

## 20. WAS THE METHOD ADOPTED BY THE COURT FOR THE POLL OF THE JURY IMPROPER?

 Following the verdict, defense counsel requested that the jury be polled, whereupon the Deputy Clerk asked *each* juror on *each* of the 17 Counts the following question: "You have heard the verdict of *guilty* read and recorded in the case of United States of America versus Keith Farries et al. Is that your verdict?" Defendants contend that by permitting each juror simply to state "Yes" or "No" was error. No cases have been cited to support this contention.

In Humphries v. District of Columbia, 174 U.S. 190, 194, 19 S.Ct. 637, 638, 43 L.Ed. 944, the Court indicated that the object of a jury poll is "to ascertain for a certainty that each of the jurors approves of the verdict as returned; that no one has been coerced or induced to sign a verdict to which he does not fully assent". The method employed in this case met that purpose and was therefore not error.

The Defendants and all counsel were courteously treated throughout the trial. The jury was attentive and discriminating. The atmosphere in the courtroom of dignity and decorum to which defendants were entitled was preserved despite imminent threats of disruption. Defense counsel were dedicated and capable. These defendants were, in my opinion, given as impeccably fair a trial as it is possible for any defendants to receive.

For the reasons set forth, the motions for a new trial will be denied. An appropriate order will be entered.