**UNITED STATES of America**

v.

**Ronald FUREY, Joseph DiLuzio.**

**Crim. No. 79–268.**

United States District Court,
E. D. Pennsylvania.

May 14, 1980.

Peter F. Vaira, U. S. Atty., Luther E. Weaver, III, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Steven Morley, Defender Ass'n of Philadelphia, Philadelphia Pa., for Furey.

Edward A. Savastio, Upper Darby, Pa., for DiLuzio.

## MEMORANDUM OPINION AND ORDER

BECHTLE, District Judge.

Presently before the Court are the motions of the defendants Ronald Furey ("Furey") and Joseph DiLuzio ("DiLuzio") for a new trial and/or judgment of acquittal, pursuant to Fed.R.Crim.P. 33 and 29(c). After careful review of the arguments of counsel, the factual record of this case and the applicable judicial authority, the Court will deny the defendants' motions.

This case focused on a residential development project commonly known as "Ravenscliff," which is composed of approximately 126 acres of property located in Radnor and Newtown Townships in Delaware County, Pennsylvania. Three companies were involved in the development project, including Ravenscliff Land Company (the land holder), Ravenscliff Development Company (the builder) and Roach Brothers, Inc. (the real estate agency selling the residential dwellings). All three companies are Pennsylvania corporations doing business in interstate commerce. Robert Roach is the president and majority stockholder in the companies and Lawrence Flick ("Flick") is the vice-president.

On July 21, 1978, Ravenscliff filed a subdivision plan for approval with Radnor Township. The plan provided for the immediate sale of a mansion house located on the tract and the subsequent construction and sale of single-family residences on the surrounding acreage.

The tax assessments on the Ravenscliff property that was to be subdivided was approximately $155,000, which was spread over five separate parcels. Due to the new subdivision plan, it became necessary to have a new assessment to reflect individual assessments for the new 100 lots on which the homes would be built.

In Delaware County, as in many other counties in Pennsylvania, the Tax Assessment Office establishes the assessments on properties located in the county. These assessments, established on a county basis, are then used by the various municipalities and school districts within the county to determine the actual tax by multiplying the assessment by the millage rate adopted by the local taxing authority. Needless to say, because the tax to be paid on a property by the landowner is a serious consideration for both the buyer and the seller, the assessment, resting at the core of that factor, looms large in the decision-making process as a real estate development progresses from raw ground to the settlement date with the buyer.

Furey was the sole tax assessor for Radnor Township during the period from October, 1978, until February 2, 1979, when he was terminated. From May 29, 1979, when he was reappointed, until the present, Furey was a tax assessor in the county office but he was assigned to another township located in Delaware County. When he was discharged from his position as tax assessor for Radnor Township in February of 1979, Furey was replaced by Thomas Thornton. DiLuzio was a real estate salesman in Delaware County and was a personal friend and business associate of Furey at all relevant times.

The details of the extortion scheme charged in the indictment, as outlined by the Government's evidence, were as follows: There were a series of meetings and telephone conversations between Furey and DiLuzio with Flick concerning what the tax assessment was to be for the developing Ravenscliff project. These meetings and conversations took place between October of 1978 and August of 1979. The evidence at trial revealed that at these meetings, and during various telephone conversations, Furey attempted to extort monies from Flick by reason of his official position as tax assessor assigned to Radnor Township and through the use of threats of adverse economic consequences to the development of Ravenscliff. Furey said that, unless certain money was paid to him by Flick, he would,

by reason of his official position as tax assessor, cause a higher tax assessment to be placed on the Ravenscliff development than would be set if the money was paid. The great majority of the telephone conversations and meetings, excluding the initial October 17, 1978, meeting, were recorded by agents of the Federal Bureau of Investigation ("FBI") at the request of Flick but without the knowledge of the defendants. Flick had notified the FBI soon after the initial extortion attempt took place during an October 17, 1978, meeting between Flick, Furey and DiLuzio which had not been recorded. These tape recordings were offered at trial by the Government and played to the jury.

DiLuzio, according to the Government's evidence, was to act as an intermediary between Furey and Flick, passing the monies being extorted. DiLuzio was to be paid for his services.

The three-count indictment charged both Furey and DiLuzio in count one with attempted extortion of $10,000 from the Ravenscliff companies, Lawrence Flick and Robert Roach, in violation of 18 U.S.C. § 1951,[1] often referred to as the Hobbs Act. Count one charged the defendants with attempting to extort monies on or about October 17, 1978, through the wrongful use of color of official right and fear of economic loss. Count two of the indictment charged

---

1. 18 U.S.C. § 1951 states:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

(1) The term "robbery" means the unlawful taking or obtaining of personal property *from the person or in the presence of another*, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in

his company at the time of the taking or obtaining.

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

(c) This section shall not be construed to repeal, modify or affect section 17 of Title 15, sections 52, 101–115, 151–166 of Title 29 or sections 151–188 of Title 45.

Furey alone with attempting to extort approximately $200 from the same victims on or about March 1, 1979, under color of official right and through fear of economic loss, in violation of 18 U.S.C. § 1951. Finally, count three of the indictment charged both defendants with conspiracy to commit extortion under color of official right and through fear of economic loss, in violation of 18 U.S.C. § 1951. After a 10-day trial, involving some 28 witnesses, the jury found both defendants guilty on all counts.

The post-trial motions of the defendants raise several separate issues, which will be addressed by the Court individually.

## I. *Voir Dire Questions to the Jury Panel*

The first ground raised by Furey concerns the Court's refusal to ask certain of Furey's proposed *voir dire* questions:

13. Does the fact that this case involves the alleged extortion by a tax assessor offend your sensibilities in such a way that it would prevent you from rendering a fair verdict based solely upon the evidence presented at trial?

14. Does the fact that this case involves misconduct by a public official render you unable to give a fair verdict based solely on the evidence at trial and not on any preconceived notions?

Furey contends that the Court's refusal to ask these questions of the jury panel constituted a violation of his due process right to a fair and impartial jury. Furey claims that, because the instant action is based on the Hobbs Act, 18 U.S.C. § 1951, which can involve the prosecution of public officials for the wrongful performance of their official duties, it was essential to secure an impartial jury devoid of any bias against political figures or public officials. Furthermore, Furey alleges that an inquiry into any hidden prejudices and biases was necessary in the instant action because the

basis of his defense was that "while he was a public official he performed work which might have had an impact on his job, but for which he felt that he was entitled to outside compensation." Furey's Motion for New Trial and/or Judgment of Acquittal, at 2. This position, Furey argues, may have led to the appearance of a conflict of interest, causing some jurors to view his activities with a jaundiced eye due to what he calls the "post-Watergate mentality." The Court fully agrees with the defendant's contention that prejudices and biases, possibly as to political figures in general, is a permissible area for *voir dire* examination. However, the Court disputes the *manner* in which the defendant suggests this inquiry should have been undertaken. The question is whether the Court's questions sufficiently "probe[d the] hidden prejudices of the jurors," *U.S. v. Wooton*, 518 F.2d 943, 945 (3d Cir. 1975), or whether the proposed questions were further needed to ferret out the hidden biases of panel members.

■ Under Fed.R.Crim.P. 24(a),[2] the trial court may, in its own discretion, conduct the *voir dire* of the jury panel. The form and manner of questioning of the panel are matters within the court's sound discretion, with the "widest discretion" necessary reposed in the trial judge. *Kiernan v. Van Schaik*, 347 F.2d 775, 778 (3d Cir. 1965). This discretion is necessary because, "[t]he determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Rideau v. Louisiana*, 373 U.S. 723, 733, 83 S.Ct. 1417, 1423, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting). *See also U.S. v. Segal*, 534 F.2d 578, 581 (3d Cir. 1976); *U.S. v. Starks*, 515 F.2d 112, 124–125 (3d Cir. 1975). The exercise of these broad discretionary powers of the trial judge is a ground for error only when basic notions of

---

2. Fed.R.Crim.P. 24(a) states:

 (a) *Examination.* The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors *or may itself conduct the examination.* In the latter event the court shall permit the defendant or his

attorney and the attorney for the government to supplement the examination by such further inquiry *as it deems proper* or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys *as it deems proper.*
(Emphasis supplied.)

fairness have been violated on a constitutional scale. *Hamling v. U.S.*, 418 U.S. 87, 140, 94 S.Ct. 2887, 2918, 41 L.Ed.2d 590 (1974); *Ham v. South Carolina*, 409 U.S. 524, 527–528, 93 S.Ct. 848, 850–851, 35 L.Ed.2d 46 (1973). For example, such rare violations have been found by the United States Supreme Court in the area of racial bias. The Court held in *Ham, supra,* and *Aldridge v. U.S.*, 283 U.S. 308, 311, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931), that racial issues were so intertwined with the factual and legal underpinnings of a case involving allegations of racial discrimination that specific inquiry as to possible racial bias among jurors was constitutionally required. *See also U.S. v. Williams*, 612 F.2d 735, at 736 (3d Cir. 1979).

■ Whether general questions will adequately expose possible bias and prejudice, or whether specific questions are mandated, depends on whether "the demands of due process could be satisfied by [a] more generalized but thorough inquiry into the impartiality of the veniremen." *Ristaino v. Ross*, 424 U.S. 589, 598, 96 S.Ct. 1017, 1022, 47 L.Ed.2d 258 (1976). *See also U.S. v. Taylor*, 562 F.2d 1345, 1355 (2d Cir. 1977); *U.S. v. Steinberg*, 551 F.2d 510, 515 (2d Cir. 1977). For example, specific questions were not required in the case of a bearded defendant because of the court's inability "to constitutionally distinguish possible prejudices against beards from a host of other possible similar prejudices." *Ham, supra*, 409 U.S. at 528, 93 S.Ct. at 851.

Furey has cited, as supporting authority for the method of asking specific questions rather than general questions, *U.S. v. Dellinger*, 472 F.2d 340 (7th Cir. 1972), where the court stated:

> The government argues that the court is obligated to inquire only into matters that would disqualify the juror for cause, and that the court's first group of questions were adequate to produce disclosure of any relevant prejudice. We disagree. The government's position must rest upon an assumption that a general question to the group whether there is any reason they could not be fair and impartial can

be relied on to produce a disclosure of any disqualifying state of mind. We do not believe that a prospective juror is so alert to his own prejudices. Thus it is essential to explore the backgrounds and attitudes of the jurors to some extent in order to discover actual bias, or cause.

472 F.2d at 367.

■ Nevertheless, this Court finds that the possibly never-ending deluge of specific questions during *voir dire* is not constitutionally mandated in each case where generalized questions can substantially serve the same due process purposes. Supportive of this position is the holding of the Fifth Circuit Court of Appeals in *U.S. v. Williams*, 573 F.2d 284 (5th Cir. 1978), in which the court stated: "The trial judge's failure to ask the requested questions is not an abuse of discretion if his *overall examination,* coupled with his charge to the jury, affords a party the protection sought." *Id.,* at 287 (emphasis added). *See also U.S. v. Goodwin*, 470 F.2d 893, 898 (5th Cir. 1972).

In the instant action, the Court explained to the jury panel during *voir dire* questioning that Furey had served as a public official in the capacity of tax assessor during certain time periods covered by the indictment [N.T., *Voir Dire* at 15]. This statement clearly put the jury on notice that this case concerned political figures. In the same vein, the Court asked whether any member of the panel or their relatives then or ever worked for the government, either state, local or federal [N.T., *Voir Dire* at 81], including the Delaware County Tax Assessor's Office [N.T., *Voir Dire* at 15]. Several jurors responded in the affirmative [N.T., *Voir Dire* at 81–107]. Once again, the jurors were made to understand the political nature of the instant action and to be cognizant that political favoritism or nepotism should not play any role whatsoever in the case. With these factual inquiries in mind, the Court finally asked the jury panel whether there was any other factor that they believed could prevent them from being fair and impartial jurors or would prevent them from following the instructions of the Court "in a case like this" [N.T.,

Voir Dire at 116]. Clearly, the jury understood that the Court was referring to each and every articulated aspect of the case at bar. Any doubt on this point was disspelled when one juror stood up in response to this general question. He responded that, whereas this case involved real estate firms and sales personnel [N.T., *Voir Dire* at 7] and whereas panel members were asked to indicate whether they had any relations with the real estate firms in the instant case [N.T., *Voir Dire* at 9–11], he had had a bad experience with real estate persons in the past and felt that these experiences had sufficiently prejudiced him against the real estate industry such that he could not be a fair and impartial juror in this case [N.T., *Voir Dire* at 116–118]. The Court immediately struck that juror "for cause." This incident is important for several reasons. The Court had asked parallel questions concerning the political nature as well as the real estate context of the case. Therefore, if any other member of the jury panel had felt that the political nature of "this case" would have affected his or her impartiality, he or she would have followed the example of the juror with the bias against the real estate industry. However, no member of the panel so responded.

The Court also made the following general statement, to which responses indicating a lack of bias were given:

You have heard all of the questions I have asked, all of you. You have had a chance to think about some things. And obviously the Court doesn't ask all the possible questions that could be asked. And it is a question of trying to ask those questions that experience has told us are usually the most useful.

Now you have had a chance to think about the questions and many of you have furnished answers. Some of you have furnished a variety of answers.

N.T., *Voir Dire* at 114.

For these reasons, the Court determined that defense counsel's request that the Court ask proposed questions 13 and 14 should be denied because the subject matter of those questions had been sufficiently cov-

ered by the Court's prior questioning. *See* N.T., *Voir Dire* at 118–119. Any possibility of bias or prejudice existing in the minds of the jury panel concerning the political or real estate context of the case was sufficiently explored by the Court's questions and a more detailed inquiry was simply not necessary. Finding that no due process violation occurred, the Court also finds that the goals of judicial economy were served by its ruling. Furthermore, if there were any doubt as to the jury's impartiality, the Court's charge surely cured it:

In that regard, I mentioned to you earlier when you were called for jury service that your function, therefore, also by definition requires that you be impartial. That is, the case cannot be decided on the basis of sympathy or prejudice for or against any party in the case. The case can be decided only on the evidence.

N.T. 10–11.

Finally, of particular importance is the holding of the United States Supreme Court in *Connors v. U.S.*, 158 U.S. 408, 15 S.Ct. 951, 39 L.Ed. 1033 (1894), in which the Court, in an older but still controlling opinion, held that the failure of the trial court to ask the following question during *voir dire* was not prejudicial to the defendants who were charged with election fraud: "Would your political affiliations or party predilections tend to bias your judgment in this case either for or against the defendants?" 158 U.S. at 414, 15 S.Ct. at 953. The Court held:

In the absence of any statement tending to show that there was some special reason or ground for putting that question to particular jurors called into the jury box for examination, it cannot be said that the court erred in disallowing it. If the previous examination of a juror on his *voir dire* or the statements of counsel, or any facts brought to the attention of the court, had indicated that the juror might, or possibly would, be influenced in giving a verdict by his political surroundings, we would not say that the court could not properly, in its discretion, if it had regarded the circumstances as excep-

tional, have permitted the inquiry whether the juror's political affiliations or party predilections would bias his judgment as a juror. But no such exceptional circumstances are disclosed by the record, and the court might well have deemed the question, unaccompanied by any statement showing a necessity for propounding it, as an idle one that had no material bearing upon the inquiry as to the qualifications of the juror, and as designed only to create the impression that the interests of the political party to which the accused belonged were involved in the trial. The public should not be taught, by the mode in which trials of this character are conducted, that the prosecution of a crime against the laws securing the freedom and integrity of elections for representatives in congress will be regarded by the court as, in effect, a prosecution of a political party to which the accused belongs. If an inquiry of a juror as to his political opinions and associations could ever be appropriate in any case arising under the statute in question, it could only be when it is made otherwise to appear that the particular juror has himself by his conduct or declarations given reason to believe that he will regard the case as one involving the interests of political parties rather than the enforcement of a law designed for the protection of the public against frauds in elections.

158 U.S. at 414–415, 15 S.Ct. at 953–954.

The Court finds that no exceptional circumstances existed which warranted the specific questions requested by the defendant. If a juror had stood up after the Court's general question about any other bias or prejudice, to which the aforementioned juror did rise, then further inquiry concerning that hypothetical juror's political bias or prejudice might have been justified, but no such juror responded in that manner, other than the juror with the real estate bias who was further questioned by the Court.

■ Therefore, for all the above reasons, the Court finds that in the instant action

the refusal of the Court to ask the specific *voir dire* questions 13 and 14 proposed by Furey did not constitute an abuse of the Court's sound discretion and, therefore, did not rise to the level of a constitutional violation of the defendant's due process right to a fair and impartial jury as has been defined by judicial opinion.

## II. *Court's Charge as to Bribery*

Furey and DiLuzio next contend that the Court erred in not giving Furey's proposed point for charge 9, which stated:

9. The government has charged the defendant under two theories of Hobbs Act —extortion. One is that property was procured or attempted to be procured from the victim by actual fear of economic loss. This requires proof beyond a reasonable doubt that the defendant wrongfully used actual fear to induce Roach Brothers to pay him money. Unless the payment made, or attempted, was made under some form of compulsion, threat, duress, or coercion there is no crime under the Hobbs Act. The mere voluntary payment of money, unaccompanied by any fear of economic loss, does not constitute extortion. Such conduct might constitute bribery. Bribery is a different crime from extortion and the defendant is not charged with it. If you find the defendant guilty, you must do so on the basis of the evidence demonstrating his guilt of extortion only.

The second theory of the government is that the defendant conspired and attempted to extort "under the color of official right." Extortion under "color of official right" means that property was unlawfully obtained from another person by a public officer, under the color of his office, and the property so obtained was not due and owing to the public officer, nor was the property due and owing to the office he represented. This type of extortion by a public officer does not require proof of any specific threats or the use of fear. It is required, however, that the public official be the initiator or inducer of the obtaining of the money or

property. It is this requirement of inducing or initiating by the action or inaction of the defendant that distinguishes this crime from bribery. Before you can convict the defendant, you must believe beyond a reasonable doubt that he in some manner induced or initiated a transaction in the payment of money to him as charged in the Indictment. Again, the mere passive receipt of money is an insufficient basis for conviction.

An integral part of the defense in this case was the contention that, if Furey did commit actions that were improper, he did so because he was induced to do so by Flick, the alleged victim of the extortion plot. Furey claimed that Flick initiated the meeting of October 17, 1978, at which time tax assessments for the Ravenscliff project were discussed, and that Flick initiated the arrangement for the payment of money in return for a favorable tax assessment by Furey. In the alternative, Furey argues that the mere passive receipt of money cannot be extortion because a public official, under the Hobbs Act, must have "initiated and induced" the payment from the victim. Furey claims that Flick induced the payment, thus constituting bribery on the part of Flick and not extortion by the defendants.

There were two separate theories raised in the indictment, those being that the defendants committed extortion by: (1) wrongfully acting under color of official right; and, (2) through the wrongful use of fear of economic loss. Under these two theories, three questions must be addressed: (1) whether the Court erred in not charging the jury on the crime of bribery; (2) whether the Court erred in not charging the jury on the "initiate and induce" language proposed by the defendants; or, (3) whether the Court erred in not charging the jury that the mere passive receipt of money does not constitute the crime of extortion.

█ First, under the color-of-official-right theory, the courts have held that there is no requirement that the court specifically instruct on the crime of bribery in an extortion case, even assuming that the two

crimes are mutually exclusive, which many courts have denied. *See U.S. v. Hathaway*, 534 F.2d 386, 395 (1st Cir. 1976); *U.S. v. Kahn*, 472 F.2d 272, 277 (2d Cir. 1973). As the Third Circuit Court of Appeals held in *U.S. v. Addonizio*, 451 F.2d 49 (3d Cir. 1971):

> Even assuming *arguendo* that the appellants are correct as to the state of evidence and as to the mutual exclusivity of the crimes [of bribery and extortion] we have concluded that no error was committed, for the court delivered an adequate charge on the legal questions involved. As outlined in VI.A., supra, the essence of the crime of bribery is voluntariness, while the essence of extortion is duress. *People v. Dioguardi* [8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960)], supra; *Hornstein v. Paramount* [*Pictures*, 22 Misc.2d 996, 37 N.Y.S.2d 404 (1942)], supra. Although the court did not mention the word "bribery" in its charge, it adequately set forth the characteristics distinguishing bribery from extortion. *There was no need to instruct in detail as to an offense for which the defendants were not on trial. Bianchi v. United States*, 219 F.2d 182 (8th Cir. 1955).

451 F.2d at 77 (emphasis supplied) (footnote omitted).

█ Regarding the refusal to specifically charge as to the requested initiate-and-induce language, this also goes to the same arguments raised in refusing to charge as to bribery. If the victim initiated the contact with the alleged extorter and induced payments to be made to the extorter, this would constitute bribery on the part of the victim. However, as many courts have held, the crimes of bribery and extortion are not mutually exclusive so that the proof of one does not constitute a *per se* defense to the other. A victim could be guilty of attempted bribery and the defendant, at the same time, could be guilty of attempted extortion after the bribe was attempted, as long as the requisite acts and intents existed for each (*e. g.*, the extorter attempted to extort a larger sum of money

than had been offered in the bribery attempt). Furthermore, the Court did charge that the defendants must have been found to have induced the victims to have parted with their property under color of official right [N.T. 10–21].

However, as the Government correctly noted, the "defense" of bribery and, hence, the need for the initiate-and-induce language was never offered because Furey asserted that he did not accept money in his capacity as tax assessor but received the money in an individual capacity for private employment purposes. The Court need not charge the jury on an issue not presented by the evidence. *See Hallowell v. Keve*, 555 F.2d 103, 107 (3d Cir. 1977).

 As to the mere passive-receipt-of-money language requested by the defendants, as it relates to the theory of wrongfully acting under color of official right, the Court fully agrees that the mere passive receipt of money does not constitute a violation of the Hobbs Act. *See Hathaway, supra*, at 393–395; *Addonizio, supra* at 78. However, the mere passive receipt of money is only one example of the general defense available to the defendants under the Hobbs Act that there can be no misuse of official authority when monies are only received in a private, and not an official, capacity. The Court did charge the jury that the money must be wrongfully obtained under the color of official right, thereby making it inherently clear that money received legally and not under color of official right would not constitute extortion [N.T. 10–15, 16]. This defense was a matter more properly raised in greater detail by defense counsel during their closing arguments, which was invited by the Court and which was actually done by defense counsel [N.T. 9–110, 113, 121, 138, 143].

 Second, as to the theory of fear of economic loss, the requested bribery charge need not have been given for the same reasons stated by the court in *Addonizio, supra*. The initiate-and-induce language was not given by the Court, because the Court had already charged the jury that it was necessary, for attempted extortion to

be proven under the theory of fear of economic loss, that a reasonable person in the victim's circumstances would have been in fear of economic loss due to the actions of the defendant [N.T. 10–22, 23]. Therefore, the "initiate-and-induce" charge was subsumed within the fear instruction. The fact, if true, that Flick induced and initiated the payment would indicate the absence of fear. *See U.S. v. Duhon*, 565 F.2d 345, 351 (5th Cir. 1978). This would present an example of a lack of fear of economic loss that the defendants were specifically invited by the Court to argue in their closing statements and which, in fact, they did [N.T. 9–118, 123, 124, 137, 138, 139, 140].

 Finally, as to the refusal of the Court to charge that the mere passive receipt of money does not constitute extortion under the theory of fear of economic loss, again, this would evidence a lack of fear of economic loss on the part of the victim because he would be passing money voluntarily and not involuntarily due to the exploitation of the extorter of his fear of economic loss. Once again, this was a defense available to the defendants which the Court permitted the defendant to argue to the jury as an example of a lack of fear of economic loss and which, in fact, they did [N.T. 9–118, 123, 124, 137, 138, 139, 140].

### III. Mistake of Law as a Defense to the Crime of Extortion

Furey argues that the Court erred in not charging the jury in accordance with his proposed point for charge 10, which stated, in part, that mistake of law can be an excuse under the Hobbs Act.

The traditional maxim that ignorance of the law is no excuse is still very much alive, *U.S. v. International Min'ls Corp.*, 402 U.S. 558, 563, 91 S.Ct. 1697, 1700, 29 L.Ed.2d 178 (1971), and is supported by strong public policy considerations. *U.S. v. Barker*, 546 F.2d 940, 948 n.23 (D.C.Cir. 1976); *U.S. v. Cianciulli*, 482 F.Supp. 585, 620–623 (E.D. Pa.1979). While there are various judicially created exceptions to this general rule, none are applicable to the present case because

they were either not raised by the defendants at any stage of the proceedings or were clearly not applicable to the present case. For example, ignorance of the law may be an excuse where the statute requires an act be done "knowingly," *see U.S. v. Squires*, 440 F.2d 859, 863 (2d Cir. 1971); *U.S. v. Jonas Broths. of Seattle, Inc.*, 368 F.Supp. 783, 784 (D.Alaska 1974); *American Timber & Trading Co. v. First National Bank of Oregon*, 334 F.Supp. 888, 890 (D.Or. 1971), *but see U.S. v. International Min'l Corp., supra*, or "willfully," *U.S. v. Rosenfeld*, 469 F.2d 598, 601 (3d Cir. 1972). These types of statutes are known as "specific intent" types of statutes. *U.S. v. Ehrlichman*, 376 F.Supp. 29, 35 (D.D.C.1974). *But see International Min'l Corp., supra* ; *U.S. v. Cianciulli, supra.*

▮ The Hobbs Act clearly and revealingly does not contain the "knowingly" and/or "willfully" language that brings into play the "specific intent" exception. Furthermore, the legislative history of the statute indicates that, during the passage of the

statute, an amendment had been proposed as an alternative to the present § 1951 which did contain the "knowingly or willfully" language but was subsequently rejected by Congress.[3] That Congress was aware of the alternate specific intent language but nevertheless did not include it in the presently codified § 1951 clearly indicates that the Hobbs Act was not intended to be a specific intent statute. Other courts have joined in this interpretation of the statute. *U.S. v. Warledo*, 557 F.2d 721, 729 n.3 (10th Cir. 1977); *U.S. v. Green*, 246 F.2d 155, 159–160 (7th Cir. 1957); *U.S. v. Bryson*, 418 F.Supp. 818, 826 (W.D.Okl.1975).

Furthermore, the legislative history of the statute also clearly indicates that Congress intended to enact a strong, broad-based legislative provision that could not be narrowly applied to circumvent the congressional goals of effectively putting an end to the serious problem of extortion, notably in the area of labor racketeering affecting interstate commerce.[4] The United States Su-

---

3. The following alternative amendment was proposed during the House debate on the presently enacted Hobbs Act, but was rejected by Congress:

 Sec. 201. Any person or persons who shall, during the war in which the United States is now engaged, *knowingly and willfully*, by physical force or intimidation by threats of physical force, obstruct or retard, or aid in obstructing or retarding, or attempt to obstruct or retard, the orderly transportation of persons or property in interstate or foreign commerce, or the transportation of troops, munitions, war supplies, or mail, or the orderly make-up, movement, or disposition of any train, railway or highway vehicle, airplane, or vessel, on any railroad, street, highway, airway, or waterway, or elsewhere in the United States, which is engaged in transportation in interstate or foreign commerce or in the transportation of troops, munitions, war supplies, or mail, shall be deemed guilty of a felony, and upon conviction thereof shall be subject to a fine of not more than $10,000 or imprisonment for not more than 20 years, or both such fine and imprisonment; and the President of the United States is hereby authorized, whenever in his judgment the public interest requires, to employ the armed forces of the United States to prevent or remove any such obstruction to or retardation of the passage of the mail, or the orderly transportation or movement of interstate or foreign commerce, or the trans-

portation of troops, munitions, or war supplies in any part of the United States whether by air, motor, rail, express, water, or otherwise. For the purpose of this paragraph the United States shall be deemed to include all Territories and possessions of the United States.

91 Cong.Rec. 11918–11919 (1945) (emphasis supplied).

4. Exemplary remarks detailing the purposes behind the Hobbs Act are the following made during the floor debate of the Act in the House of Representatives:

 This bill is designed simply to prevent both union members and nonunion people from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce. That is all it does.

91 Cong.Rec. 11900 (1945) (remarks of Rep. Hancock).

 Let us illustrate what we are proposing to stop by this measure we are now considering.

 Here comes a farmer with a load of produce—milk, butter, eggs, vegetables, potatoes, things he has raised and produced upon his farm. He owns that property. Into it has gone his toil and his sweat, and that of his wife and children, some of whom accompany him. As they near a State line in going to market to sell that produce a thug they never saw before or a coterie of thugs comes up to

preme Court, in *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), stated that the congressional intent behind the statute was as follows:

> That Act speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.

361 U.S. at 215, 80 S.Ct. at 272. *See also U.S. v. Green*, 350 U.S. 415, 418–419, 76 S.Ct. 522, 524–525, 100 L.Ed. 494 (1956); *U.S. v. Caci*, 401 F.2d 664, 668 (2d Cir. 1968); *U.S. v. Hathaway*, 534 F.2d 386, 393 n. 5 (1st Cir. 1976).

Therefore, under the present language of the Hobbs Act, mistake of law is not an excuse for the actions proscribed under the Act and the Court was correct in not charging as requested to by the defendants as to mistake of law.

## IV. *Requisite Intent Under the Hobbs Act*

Furey contends that the Court erred in not charging the jury on the Government's requested point for charge 35, which was

> the truck and says, "Here, stop your truck." The farmer says, "Why, I do not want to stop my truck. I am going to market." The thug says, "Yes; but you stop your truck." The farmer asks, "Well, what do you want?" The thug says, "I want $9.42 if it is a big truck and $8.41 it (*sic*) it is a little truck."
>
> The farmer says, "I don't want to pay it. I don't need your help." The thug says, "Yes; but if you do not pay me I will knock you in the head and knock your child or your wife in the head." Maybe it is the man's wife who is with him. Then, in fear, not wishing to be mutilated or perhaps killed, and not desiring to see his wife and child killed, the farmer pays the money.
>
> Outrages like this are what this law is aimed at. I wonder what it is that so deranges the thinking of a full-grown man that he would get up here and say that any man, or any set of men, anywhere in this land have the right to commit robbery.
>
> 91 Cong.Rec. 11911 (1945) (remarks of Rep. Jennings).
>
> The bill is to prevent a repetition of the physical violences by members of labor unions on those engaged in interstate commerce. It is to prevent a repetition of the assaults and attacks upon the drivers of trucks with produce entering New York City

endorsed by the defendants and that stated, in relevant part:

### FEAR OF ECONOMIC HARM "FEAR"

In Count One, both defendants are charged with attempted extortion and in Count Two, defendant Ronald Furey alone is charged with attempted extortion.

As noted earlier, one theory pursuant to which the Government is proceeding is that the defendants attempted to instill fear of economic harm into the victims to cause the victims to part with money not lawfully due the defendants.

Since only *attempted* extortion is charged, and not a completed extortion, the Government does not have to prove that the defendants were successful in causing the fear—that the victims were actually fearful of the consequences. All that the Government is required to prove when an attempt is charged is that the defendants *attempted* to cause this fear.

In lieu of that proposed charge, the Court charged the jury as follows:

> and similar cases. It punishes extortion and robbery no matter by whom committed. It pronounces the acts of those who assault and extort from the operators of trucks engaged in legitimate interstate commerce crimes with penalties.
>
> There have been wanton assaults upon the operators of trucks by members of labor unions. No excuses have been offered for their crimes. They are exempt from Federal prosecution because of a technical defect in the antiracketeering statute. The objectives of the sponsors of labor unions and organized labor are without merit. It is time for labor to clean house. The Antiracketeering Act should be strengthened and clarified. The pending bill will provide for punishing racketeers who rob or extort. There is no justification for labor unions opposing the bill as it constitutes no invasion of the legitimate rights of labor. Robbery and extortion by members of labor unions must be punished. Labor unions owe that much to the public. In demanding the protection of laws, labor unions should urge that those engaged in legitimate interstate commerce be protected from robbery and extortion.
>
> 91 Cong.Rec. 11913 (1945) (remarks of Rep. Whittington). *See also* 91 Cong.Rec. 11917 (1945) (remarks of Rep. Rivers).

The Government does not have to prove under the fear of economic loss theory that a defendant had the actual capability of carrying out the threats made. The Government must merely prove that the defendant intended wrongfully to exploit the circumstances of the victim and it is not necessary that the defendant had the intention or the ability to carry out the threats. He must have the intention to do what he does and say what he says, and if the result of that is to instill fear of economic loss in a reasonable person in the position of the victim, then that's sufficient to make out the offense.

N.T. 10–24.

In determining whether there has been a violation of the Hobbs Act, there are three separate areas of inquiry: (1) the acts that the defendant committed; (2) the requisite state of mind of the victim; and, (3) the requisite state of mind of the defendant. While the defendant's argument concerns the last of the three areas, in order to answer that argument, it is first necessary to understand the interrelationship between the first two inquiries and the third inquiry under the Act.

Attempted extortion through exploitation of fear of economic loss, one theory of the instant action, is committed, first, when the defendant or a third person attempts to instill fear in the victim by the commission of various acts, which could include threat of economic loss to the victim unless the victim bows to the defendant's demands. This is followed by the defendant alone attempting to extort property by exploiting this previously instilled fear in the victim. The victim parts with his property under fear of economic loss consensually, but obviously not voluntarily. Under attempted extortion, the property need not be actually *obtained* by the defendant, but the jury must find only that it *could* have been obtained. *U.S. v. Sweeney*, 262 F.2d 272, 275 (3d Cir. 1959). *See also U.S. v. Green*, 246 F.2d 155, 159 (7th Cir. 1957). This attempt to wrongfully obtain the property of the victim is another way of saying

that the defendant is obtaining the property devoid of any legal right under either state or federal law. Instead, the property is obtained by the exploitation of or playing upon the victim's fear, which in turn induces the victim to involuntarily part with his property to the defendant. *U.S. v. Duhon*, 565 F.2d 345, 351 (5th Cir. 1978); *Addonizio, supra* at 76–77; *Bianchi v. U.S.*, 219 F.2d 182, 195–196 (8th Cir. 1955). *See also* 91 Cong.Rec. 1190 (remarks of Rep. Walter). *See generally* 31 Am.Jur.2d [Extortion, Blackmail, etc.] § 23 at 916–917.

Finally, the actions of the defendant must in some way or degree affect interstate commerce. *U.S. v. Caci*, 401 F.2d 664, 668 (2d Cir. 1968); *U.S v. Battaglia*, 394 F.2d 304, 312 (7th Cir. 1968); *U.S. v. Pranno*, 385 F.2d 387, 390 (7th Cir. 1967).

The victim's fear must be a reasonable fear, under all the circumstances of each particular case. *U.S. v. Brown*, 540 F.2d 364, 373 n.6 (8th Cir. 1976); *U.S. v. Provenzano*, 334 F.2d 678, 687 (3d Cir. 1964). In attempted extortion cases, it is not necessary that the victim actually be placed in fear of economic loss but only that a reasonable person in the victim's situation would have been placed in fear of economic loss due to the acts of the defendant or a third person. *U.S. v. Frazier*, 560 F.2d 884, 887–888 (8th Cir. 1977).

As to the requisite intent of the defendant, it is important to keep in mind that § 1951 is only a general intent statute, as previously discussed, and not a specific intent type of statute. A general criminal intent is required, however. *U.S. v. Sweeney, supra* at 275 n.3. Therefore, the defendant must have the general intent to exploit the fear or use the fear of the victim in order to wrongfully obtain the property. *U.S. v. Duhon, supra* at 351; *Callanan v. U.S.*, 223 F.2d 171, 174–175 (8th Cir. 1955). The critical element is that the defendant played upon or exploited the fear of the victim and, by doing so, wrongfully obtained the property of the victim with his consent but involuntarily.

Furey would add an additional intent requirement under the Act—that being that the defendant must intend to instill fear in the mind of his victim and not merely that the natural and necessary consequence of the defendant's act was or could have been to instill fear in the victim, as the Court charged [N.T. 10–24].

Not every criminal act has a concomitant element of intent. Thus *actus non facit reun, nisi mens sit rea* is not strictly applicable. An example is the requirement under the Hobbs Act that the defendant's actions must affect interstate commerce in any way or degree. Judicial decisions have held, however, that the defendant need not intend that his actions actually affect interstate commerce but only that the natural and necessary effect of his actions be to affect interstate commerce. *See U.S. v. Pranno, supra; U.S. v. Battaglia, supra; U.S. v. Caci, supra.*

In order to adequately and fully explore the intent requirements of the Hobbs Act, it is necessary to examine the New York extortion law as it existed prior to the passage of the Hobbs Act in 1945. New York state penal law was recognized as controlling on the issue of the intent required under the Hobbs Act during the floor debate of the passage of the Act by the sponsor, Representative Hobbs. He stated during debate of the Act on the floor of the House of Representatives that:

> In addition, that cannot be seriously contended except as just a window dressing in opposition to this bill because there is nothing clearer than the definitions of robbery and extortion in this bill. They have been construed by the courts not once, but a thousand times. The definitions in this bill are copied from the New York Code substantially. So there cannot be any serious question along that line by the gentlemen from New York who are the leaders of the fight against the bill.

91 Cong.Rec. at 11900 (1945).

This analytical methodology has been specifically approved by the Third Circuit Court of Appeals in *U.S. v. Nedley*, 255 F.2d 350, 355 (3d Cir. 1958), and *U.S. v. Sweeney,*

*supra* at 275 n.3. As the court stated in *U.S. v. Nedley, supra* :

> In House debate on the bill, Representative Hobbs, its sponsor, stated "there is nothing clearer than the definition of robbery and extortion in this bill. *They have been construed by the Courts not once, but a thousand times.* The definitions in this bill are copied from the New York Code substantially." To the same effect are Representative Walter's statements "that [the] definition [in the Act] is the definition of robbery contained in the New York Code", and Representative Michener's statement that "there has been and will be so much talk about what constituted robbery and extortion and it is well to remember that the New York definitions are being used in this bill."
>
> It is doubtful that legislative intent could be more clearly spelled out. That being so, we are required to look to the New York Penal Laws relating to robbery and the construction given them by the New York courts.

255 F.2d at 355 (footnotes omitted).

Prior to 1945, the New York state courts did not require that the defendant intend to instill fear in his victim but only that the effect or import of his acts *be* to instill fear in the victim. One of the earliest New York decisions in this area was *People v. Gillian*, 2 N.Y.S. 476 (N.Y.Sup.Ct., App.Div., 1888), where the court stated:

> It is sufficient if the language used in the writing, in connection with what preceded and what followed between the parties, imported a threat to charge the crime alleged, and was so understood by the parties . . . *proper and natural effect of the letter is to convey a threat* . . . The surrounding circumstances may be such that the jury would readily believe that the *purport and natural effect* of the letter was to convey a threat . . . That the letter was intended to convey a threat of some kind is manifest on the face of it . . . .

2 N.Y.S. at 478 (emphasis supplied).

More recently, the highest state appellate court in New York, in a decision reaffirm-

ing the continuing validity of prior intent requirements in extortion cases, *People v. Dioguardi*, 8 N.Y.2d 260, 203 N.Y.S.2d 870, 168 N.E.2d 683 (1960), stated:

Moreover, it is not essential that a defendant *create* the fear existing in the mind of his prospective victim so long as he succeeds in persuading him that he possesses the power to remove or continue its cause, and instills a new fear by threatening to misuse that power as a device to exact tribute (*People v. Weinseimer*, 117 App.Div. 603, 607, 102 N.Y.S. 579, 582, supra; *Callanan v. United States*, 8 Cir., 223 F.2d 171, certiorari denied 350 U.S. 862, 76 S.Ct. 102, 100 L.Ed. 764; *United States v. Varlack*, 2 Cir., 225 F.2d 665). Our statute, as well as the Hobbs or Federal Anti-Racketeering Act (U.S.Code, tit. 18, § 1951, subd. [b], par. [2]) which was patterned after it (*United States v. Sweeney*, 3 Cir., 262 F.2d 272, 275, footnote 3), talks in terms of a wrongful *use of* fear, and the ultimate issue " 'is not so much the cause of the victim's fear, as it is whether or not defendants played upon that fear, in other words, made use of that fear to extort money or property' " (*Callanan v. United States*, 8 Cir., 223 F.2d 171, 174, supra).

\* \* \* \* \* \*

The failure to establish that this fear was *initially* induced by or attributable to either defendant, or someone acting in concert with them, is not determinative, so long as there was proof that defendants "seized upon the opportunity presented by" that fear "to line their own pockets by implanting in the minds of the company officials the idea that unless and until the tribute demanded was paid to the defendants", the picketing and labor war would continue (*United States v. Varlack*, 2 Cir., 225 F.2d 665, 668, supra). The decision in *People v. Gardner*, 144 N.Y. 119, 38 N.E. 1003, 28 L.R.A. 699, implies nothing to the contrary, since the victim of an *attempted* extortion in that case was not actuated by fear of any kind, either pre-existing or newly created, and exploitation of an independently instilled fear was in no way involved.

\* \* \* \* \* \*

To ascertain whether a letter [or oral proposal] conveys a threat, all its language, together with the circumstances under which it was written [or spoken], and the relations between the parties may be considered, and if it can be found that *the purport and natural effect* of the letter [or oral proposal] *is to convey a threat*, then the mere form of words is unimportant." *People v. Thompson*, 97 N.Y. 313, 318. (Emphasis supplied.)

203 N.Y.S.2d at 877–878, 168 N.E.2d at 689–690.

■ Therefore, it becomes abundantly clear, after an examination of the applicable pre-1945 New York state law of extortion, that Congress intended that it not be necessary that the defendant intend to instill fear in the victim but only that the natural and necessary effect of the defendant's actions be to instill fear in his victim. The critical inquiry is the effect of the defendant's actions on the victim. Other courts have adopted this fundamental and just concept of a defendant being held accountable for the natural and necessary consequences of his acts. *See U.S. v. Duhon*, 565 F.2d 345, 351 (5th Cir. 1978). *See also U.S. v. Garrett*, 574 F.2d 778, 782 (3d Cir. 1978). For example, in *U.S. v. Green*, 246 F.2d 155 (7th Cir. 1957), the court noted, as to the various intent requirements under the Act to commit certain acts, that:

It is urged that there is no proof of an intent to extort. Clearly, the proof of a general intent to commit the crime charged is a necessary element. *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288; *United States v. Sutter*, 7 Cir., 160 F.2d 754. For the general rule, see 22 Am.Jur. 237, § 13. However, it is axiomatic that a person is held to intend the natural consequences of his acts. The record discloses overt conduct which reasonably constituted threat of physical violence, which admittedly was designed to force the contractors to hire unnecessary laborers. Defendants must be held to have intended

the consequences which would reasonably flow from such conduct.

246 F.2d at 159–160.

This judicial position was reaffirmed by the Eighth Circuit Court of Appeals in *U.S. v. Mitchell*, 463 F.2d 187, 192 (8th Cir. 1972), which specifically cited and concurred with the *Green* court.

This position becomes further self-evident because in *Dioguardi, supra*, the New York court held that it was only necessary that the defendant later exploit the previously instilled fear caused by another in order to wrongfully obtain the victim's property. *See also U.S. v. Duhon, supra.* If the defendant need not even have committed the acts that instilled the fear in the victim, then it is certainly less necessary that the defendant *intend* to instill that fear.

Finally, the authorities cited by Furey in support of his position only serve to support this Court's position and do not negate or undermine it. Furey specifically refers the Court to the case of *U.S. v. Nadaline*, 471 F.2d 340 (5th Cir. 1973):

> It has been held that to prove an attempt to extort it is necessary to show an attempt to arouse fear, *Carbo v. United States*, 9 Cir. 1963, 314 F.2d 718, *cert. denied* 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498.

471 F.2d at 343–344. *See also U.S. v. Frazier, supra* at 887; *U.S. v. Duhon, supra* at 351.

The *Nadaline* court's use of the term "attempt," as opposed to "intent," is important. A defendant can attempt to commit acts which could have the natural consequence of instilling fear in the victim although that result might not have been intended by the defendant. This holding is consistent with, and is merely another way of restating, the controlling New York state law which does not require intent to instill fear.

■ The proper defense inquiry is not that the defendant did not intend his acts to instill fear in his victim but that the fear of economic loss on the part of the victim was unreasonable under the circumstances. For example, if the defendant was merely joking with the victim, it would be unreasonable under certain circumstances for the victim to be instilled with fear (*e. g.*, the defendant was a friend and a known practical joker to the victim). However, under other circumstances, the fear could be very reasonable although not intended (*e. g.*, the defendant is a powerful political figure, and this is known to the victim; but he is also a practical joker, which is *not* known to the victim).

Furey's further contention that intent to exploit the fear of the victim is required under the Act is correct and was so charged by the Court [N.T. 10–24].

For all of the above reasons, the Court finds that its charge as to the requirements of intent under the Hobbs Act was consistent with the congressional purposes underlying the statute which were based on the then-existing applicable New York state law and indicated by the plain meaning of the language of the statute.

## V. *Sufficiency of the Evidence as to Count II of the Indictment*

Furey challenges the sufficiency of the evidence as to Count II of the indictment, which alleges that Furey extorted funds from Flick by wrongfully acting under color of official right and through the wrongful use of fear of economic loss, even though during the time period covered by Count II Furey was not the tax assessor for Radnor Township. Furey also claims that, under the fear of economic loss theory, there was no proof that any threat or pressure was brought to bear on Flick and that, therefore, Flick could not have been in fear of economic loss. Furthermore, Furey claims that, even if Flick experienced fear, that fear was not reasonable under the circumstances.

■ There is no need to prove a direct threat by the defendant for a Hobbs Act violation under the theory of fear of economic loss, because fear can be shown from the surrounding circumstances. *See U.S. v. Addonizio, supra*, at 73. In a prose-

cution for attempted extortion, it is also not necessary to prove that fear was actually generated in the victim, only that fear would have been generated in a reasonable person in the victim's position. *See U.S. v. Frazier, supra,* at 887.

■ Applying the law to the facts of the instant case and viewing the evidence in a light most favorable to the Government, *Glasser v. U.S.,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), it is clear to the Court that there was sufficient evidence presented by the Government under Count II of the indictment for the matter to go to the jury and that the evidence presented did support the verdict of the jury on that count. The evidence adduced at trial indicated that on March 1, 1979, a conversation between Furey, Flick and Robert Roach occurred in which Furey attempted to require Flick to pay $200. That conversation, which was recorded by the FBI, is as follows:

RF: Okay, well, well that's good too. Cause, cause this doesn't happen overnight. It will take me a little bit of time.

LF: Okay.

RF: Ah . . . then they'll all be established. Now one thing I would like if I . . . I'd like to be paid now, okay, for any mechanical work I perform for you. Let's say I give you ten hours of work . . .

LF: Mmm-hum.

RF: I'd like to be paid an amount for that and then, you know, when you get your thing at the ah settlement be paid my lump sum.

LF: Alright.

RF: How does that sound to you.

RR: Let's decide ah . . . tell us what you want now.

RF: Okay . . . I . . . let's say I put ten, fifteen hours in on this thing. I like a couple hundred dollars.

LF: Okay.

RF: Okay. And if it does . . . in some case I'll do the work here. If, if somebody says I want to see what RON FUREY's doing, I'll do it here. I prefer not to, it's easier for me to work . . . at my house.

LF: Well that's alright.

Ex. T–5 at 45.

During this conversation, Furey referred to the original October 17, 1978, threat that a higher assessment would be made on the Ravenscliff project unless $10,000 was paid to Furey, when he stated as follows:

LF: Okay, and then what would the lump sum be when, when we get it handled.

RF: Well what did we agree at in the beginning. I forget you tell me, you remind me LARRY.

LF: Yeah . . . what you said was $10,000.

RF: Alright. You'll forget ten thousand. How 'bout cutting it in half . . . five thousand.

RR: Five . . .

LF: Okay.

RF: Is it a deal.

LF: Yeah.

RF: Okay. Figure you'll save about twenty, twenty-five.

RR: Yeah. That's roughly what we figured.

RF: Well, you, you could say 20 or a little bit more, but I can . . .

LF: RON outlined it for me on this ah . . . presentation.

RF: Mmm-hum. I told LARRY a long time ago when you made assessments you make them with a pen or pencil. When you make them with a pencil you can erase them.

RR: Mmm-hum.

RF: And when LARRY and I first met, I said do you want an estimate or do you want a favor? And he was . . . were honest, I want a favor right?

RR: Mmm-hum.

RF: Cause I knew how we stood then. Ex. T–5 at 48–49.

Whether the money was to be paid for extortion reasons or as a legitimate business expense, as Furey testified at trial [N.T. 7–86], was ultimately reduced to an issue of credibility and believability. Flick testified as to his version of the purpose of the payments on March 1, and Furey testified as to his version of those payments; thus, this became an issue for the jury. *See U.S. v. Provenzano, supra* at 687. Furthermore, the plain meaning of the March 1, 1979, recorded conversation supports the verdict.

As to the claim that Flick's fear of economic loss was not reasonable under the circumstances, it is clear that Flick would not, in fact, be fearful as of March 1, 1979, due to the covert involvement of the FBI in the case. However, only an attempt to generate fear and exploit that fear is required under the statute, based on a reasonable-man standard. The Court determined at trial that there was sufficient evidence, based on the testimony of Flick and other witnesses and the recorded conversations, for the jury to determine that there was an attempt to extort under circumstances which would have instilled fear in a reasonable person in Flick's situation—that being the position of a real estate professional attempting to develop and sell a multi-million-dollar housing development, which was currently undergoing a tax assessment that could vary in amount and could have substantial ramifications regarding the profitability of the entire venture.

Furey additionally attacks the applicability of the color-of-official-right theory in Count II, because he did not hold the position of tax assessor of Radnor Township at the time of the alleged March 1, 1979, extortion attempt under Count II and, therefore, could not have acted under color of official right. In the alternative, Furey also claims that there was insufficient proof at trial to take the claim to the jury that he controlled the official functions in March of 1979 of the tax assessor of Radnor Township.

It is not necessary under a color-of-official-right theory that the defendants have the actual *de jure* power to carry out the extortion threat but only that the victim reasonably believe that the defendant possesses the power to do so. *U.S. v. Brown, supra* at 373 n. 6; *U.S. v. Mazzei,* 521 F.2d 639, 643–644 (3d Cir. 1975); *U.S. v. Varlack,* 225 F.2d 665, 668 (2d Cir. 1955); *U.S. v. Barna,* 442 F.Supp. 1232, 1235 (M.D. Pa.1978). As the Third Circuit Court of Appeals held in *U.S. v. Mazzei, supra:*

> But in order to find that defendant acted "under color of official right," the jury need not have concluded that he had actual *de jure* power to secure grant of the lease so long as it found that Kelly held, and defendant exploited, a reasonable belief that the state system so operated that the power in fact of defendant's office included the effective authority to determine recipients of the state leases here involved . . . Such an exploitation involves the wrongful use of official power that has long been punished at common law as extortion "under color of public office." . . . The issue of Kelly's belief and its reasonableness was a jury question which was submitted under appropriate instructions.

521 F.2d at 643 (citations and footnotes omitted).

Similarly, it is not necessary for the Government to prove that Furey had the ability to carry out the threats but only that Flick reasonably believed that Furey had the ability. *U.S. v. Brown,* 540 F.2d 364, 372 (8th Cir. 1976). The appearance of authority is sufficient. *U.S. v. Price,* 507 F.2d 1349, 1350 (4th Cir. 1974); *U.S. v. Emalfarb,* 484 F.2d 787, 789 (7th Cir. 1973).

Furey argues that the above cases are distinguishable from the instant action, because those cases involved either defendants who had been elected to public office but had not yet assumed office or officials attempting to exercise power beyond their jurisdiction while in office. They did not, as Furey argues, involve the factual circumstances of the present case concerning an

official recently deposed from office who is claimed to still maintain control over the functions and powers of his former office.

The issue does not turn on the present official status of the defendant or whether he has the *de jure* power to carry out his extortion plan. Granted, if the defendant has never occupied an official position and this was known to the victim, then it would be unreasonable for the victim to believe that the defendant had the power to carry out his extortion plans. Therefore, the actual power of the defendant is not the issue, but the reasonableness of the belief of the victim under the circumstances as to the defendant's power. This was clearly an issue for the jury. In the instant action, Furey, in a recorded meeting at the Roach Brothers office between Furey, Flick and Roach, assured them, when questioned as to his power to *still* affect the tax assessments for the Ravenscliff project, that even though he was no longer tax assessor for Radnor Township he could cause the then-tax assessor, Thomas Thornton, to make a lower assessment on the development:

RF: Well, all's we have to do is . . I can still do this for you, see. Now I say do this for you, I've got to do the mechanical work.

RR: Mmm-hum.

RF: I will then take it into somebody in the county, who will do the same thing that I was gonna do, issue the letter breaking things down, simple as that.

RR: Mmm-hum.

RF: I'll do all the mechanic work, same as I was gonna do before, except before in addition to that I was gonna type a letter up, etc., etc. Okay, this will now come from somebody else, not from me.

RR: Mmm-hum.

RF: Well, would have come from, somebody else anyhow.

Ex. T–5 at 7.

RR: Yeah, now how does this change it? That's what I don't understand.

RF: Alright. Then when I come back to you and I'll show you this thing . . . this is what I'm taking in, next week, the week after, etc. . . . ah . . . I'll even have a meeting with you and the fellow who's gonna do this.

LF: That'll be great.

RF: Yeah.

LF: That this NURESKI.

RF: No, no, no . . . oh no, you won't know . . .

LF: Oh you mean the guy in the Assessor's Office.

RF: Right.

LF: Okay.

 (Slight pause) . . .

LF: Who would that be?

RF: TOM THORNTON.

LF: T—H—O—N. . . .

RF: T—H—O—R . . . . oh THOMAS, you gonna spell, okay . . . T—H—O—M—A—S is THOMAS.

LF: Yeah.

RF: THORNTON . . .

LF: T . . .

RF: T—H—O—R—N—T—O—N.

LF: Is he taking your place OR ah . .

Ex. T–5 at 45.

RF: But I don't think so. It's just like this THORNTON. Hell, when he broke into the business I had him out here in Radnor drawing plans and, and taking descriptions off and all, well TOM kinda grateful.

LF: Mmm-hum.

RF: Course it gets to a point, they're not always gonna be grateful forever.

Ex. T–5 at 55.

Furey also told Flick and Roach that he could reduce the assessments on that part of the Ravenscliff project located in Newtown Township, because he could influence the then-assessor in that township:

RF: You'd like to know ah . . . if there's gone to be any changes, now I have to get together with you. Positively on the other piece, what is it, ah . . . Newtown.

LF: Yes.

RF: Cause, cause he says to me JOE said what do you want me to do.

LF: Mmm-hum.

RF: JOE, HEAVY's the ah assessor.

LF: Yeah. Mmm-hum.

RF: He's gonna do what I tell him to do.

LF: Okay.

RF: I also bought him into the business. So JOE's gonna, he, he wants me to establish the damn thing.

LF: Okay.

RF: Alright.

Ex. T–7 at 67, 68.

For these reasons, the Court finds that there was sufficient evidence under the theory of color of official right for Count II to be submitted to the jury and that the evidence was sufficient to support the jury's verdict as to that count. The ultimate issues were based on the credibility of Flick's testimony versus Furey's testimony as to the meaning of the March 1, 1979, recorded conversation. Moreover, in addition to the explanations of Furey and Flick, the jury heard the tapes themselves. It was these issues that the jury ultimately decided adversely to Furey under Count II of the indictment.

## VI. *The Westinghouse Case*

DiLuzio objects to the Court's refusal to take judicial notice of or admit into evidence the case of *Westinghouse Electric Corp. v. Bd. of Assessment Appeals*, No. 75–19490 (C.P.Del.1976), and, in doing so, ruling in open court that the decision only applied to a particular parcel of industrial real estate in the year 1976. This ruling, DiLuzio contends, negated the defense of both defendants that the appropriate tax assessment percentage in Delaware County from 1976 to the present is, as a matter of law, 15% of market value because this was

the percentage figure approved in the *Westinghouse* case as constituting a fair assessment value. Therefore, DiLuzio claims, when Furey told Flick that the tax assessment on the Ravenscliff development could go as high as 15%, he was not making a threat for extortion purposes but only pointing out to Flick a judicially approved tax assessment percentage for Delaware County which, DiLuzio argues, Flick, as a real estate professional in that county, was or should have been aware of. DiLuzio argues that the refusal of the Court to "admit" or charge on the *Westinghouse* case was prejudicial to the defendants and warrants a new trial and/or judgment of acquittal.

■■■■ First, a judicial opinion cannot be *admitted* into evidence, as was attempted by counsel for DiLuzio with the *Westinghouse* case during trial [N.T. 9–22, 61]. If admitted into evidence as an exhibit (defense counsel wanted it marked "Defendant's Exhibit # 7"), the text of the opinion, as any other exhibit, would normally be sent out with the jury during deliberations. The rather common and proper practice is for counsel, as legal advocates, to attempt to have the Court charge the jury on the point of law established by a particular judicial opinion. However, the charge will only be given when, first, the Court determines that the decisional law offered is generally applicable to the legal issues presented in the instant action and, second, that the case is specifically applicable to the findings the jury must make. Then and only then will the Court charge the jury as a matter of law as to the holding of an offered judicial authority, which the jury must then accept. In the instant action, defense counsel for DiLuzio, as an alternative to the Court admitting the *Westinghouse* opinion as a defense exhibit, requested that the Court take judicial notice of that opinion. This offer was also rejected by the Court because the Court determined that the *Westinghouse* case was limited in scope and application. First, the case concerned the tax assessment of commercial real estate which could have been different,

for assessment purposes, from residential real estate. Second, the tax assessment in the *Westinghouse* case was approved in 1976 and might not have strict applicability to a tax assessment in 1978–1979. Finally, and perhaps most importantly, while the *Westinghouse* case held that a 15% assessment on a commercial property was not unfair, it did not hold that 15% was a blanket fair tax assessment rate to be applied in all tax assessments within Delaware County, be they commercial or residential properties, as defense counsel argues the *Westinghouse* case holds. Furthermore, the case did not hold that a tax assessment lower than 15% would be too low, or even that an assessment of 16% would be too high, but only that a 15% assessment was not unfair based on the facts of the particular case. It was for these four reasons that the Court held that the *Westinghouse* case was not applicable to the present action for the purpose that it was offered by the defendants [N.T. 9–61]. Therefore, the Court's ruling on the offer of counsel in the presence of the jury was not in error but a justifiable legal finding.

Finally, defense counsel's contention that the *Westinghouse* cases binds this Court under the doctrine of *stare decisis* is completely erroneous. It is quite apparent that defense counsel does not understand the definition of the legal doctrine known as *stare decisis*, which is:

STARE DECISIS. Lat. To abide by, or adhere to, decided cases.

Policy of courts to stand by precedent and not to disturb settled point. *Neff v. George*, 364 Ill. 306, 4 N.E.2d 388, 390, 391. Doctrine that, when court has once laid down a principle of law *as applicable to a certain state of facts*, it will adhere to that principle, and apply it to all future cases, *where facts are substantially the same. Moore v. City of Albany*, 98 N.Y. 396, 410; Regardless of whether the parties and property are the same. *Horne v. Moody*, Tex.Civ.App., 146 S.W.2d 505, 509, 510. Under doctrine a deliberate or solemn decision of court made after argument on question of law fairly arising in the case, and necessary to

its determination, is an authority, or binding precedent in the same court, or in other courts of equal or lower rank in subsequent cases *where the view point (sic) is again in controversy. State v. Mellenberger*, 163 Or. 233, 95 P.2d 709, 719, 720, 128 A.L.R. 1506. Doctrine is one of policy, grounded on theory that security and certainty require that accepted and established legal principle, under which rights may accrue, be recognized and followed, though later found to be not legally sound, but whether previous holding of court shall be adhered to, modified, or overruled is within court's discretion under circumstances of case before it . . . Under doctrine, when point of law has been settled by decision, it forms precedent which is not afterwards to be departed from, and, while it should ordinarily be strictly adhered to, there are occasions when departure is rendered necessary to vindicate plain, obvious principles of law and remedy continued injustice . . . The doctrine is a salutary one, and should not ordinarily be parted from where decision is of long standing and rights have been acquired under it, unless considerations of public policy demand it . . .

The doctrine is limited to actual determinations in respect to litigated and necessarily decided questions, and is not applicable to dicta or obiter dicta . . .

Federal courts should in all instances follow the law of the state with respect to the construction of state statutes, and where that law has been determined by the courts of last resort, their decisions are "stare decisis" and must be followed, irrespective of federal courts' opinions concerning what the law ought to be, but with respect to the pronouncement of other state courts, federal courts are not so bound and may conclude that the decision does not truly express the state law.

. . .

Black's Law Dictionary 1577–1578 (4th ed. 1968) (emphasis supplied) (citations omitted).

■ A prior judicial opinion is not necessarily entitled to *stare decisis* effect in subsequent legal determinations. Any opinion can be distinguished on factual as well as legal grounds, thereby making its *stare decisis* effect on the case under consideration inapplicable for a variety of sound reasons. This was exactly, as previously discussed, what occurred in the instant action in regard to the *Westinghouse* case and its *stare decisis* effect on this Court in this case.

Finally, the position that defense counsel attempted to expound through the introduction of the *Westinghouse* case was adequately and, perhaps more properly, covered by the expert testimony of one of DiLuzio's own expert witnesses. Richard de Grouchy, a real estate broker in Delaware County qualified as an expert at trial, indicated during his testimony that a tax assessment percentage in Delaware County could be as high as 15% [N.T. 9–22, 23, 24].

Therefore, the Court finds that it did not err in refusing to either admit into evidence the *Westinghouse* case or take judicial notice of that decision by charging the jury as to its limited application.

## VII. *Sufficiency of the Evidence as to DiLuzio*

DiLuzio challenges the sufficiency of the evidence that he allegedly aided, abetted and conspired with Furey in an attempted extortion plot, in violation of the Hobbs Act. Therefore, he claims that the Court erred in denying his motion for judgment of acquittal at the close of the Government's case.

As detailed in the Government's response to DiLuzio's motion for a new trial and/or judgment of acquittal, the evidence adduced at trial indicated that DiLuzio was present at the October 17, 1978, meeting between Furey and Flick where the extortion threats, according to Flick's testimony, were made [N.T. 2–184]. Further, as indicated by Flick's testimony of that meeting, Furey told him that unless payment was made, Furey, as tax assessor for Radnor Township, would make a higher percentage assessment on the Ravenscliff development project [N.T. 2–178, 179, 180; 3–13]. The payment was to be made, according to Flick, through a "buy-back" arrangement whereby Flick would sell a vacant lot in the development to Furey, through DiLuzio as an intermediary. Then the lot would be sold back to Flick, creating a $10,000 profit accruing to both Furey and DiLuzio [N.T. 2–179, 184]. DiLuzio was introduced at this initial meeting to Flick as Furey's "associate" and the person who would be the middleman for this buy-back payment scheme [N.T. 2–184].

DiLuzio's next involvement with the extortion scheme as an aider, abettor and co-conspirator took place on October 23, 1978, in a telephone conversation with Flick which, unknown to DiLuzio, was recorded by the FBI. That conversation was prompted by a prior telephone call by Furey to Flick in which Furey indicated that DiLuzio would call Flick to arrange the mechanical aspects of the buy-back lot transfer. Shortly thereafter, DiLuzio did call Flick and told him the method by which the lot would be purchased and re-sold the same day:

JD: I give the check to the title company and then if I turn around and sell it ah, fifteen minutes later they in turn give me back a check for for . . .

LF: Okay.

JD: For the difference.

LF: Okay.

JD: So ah, you know, it's it's only a matter of bookkeeping.

LF: Right.

JD: It, actually the transfer and everything goes through but it's just a matter of ah, you know, instead of me giving them my check for twenty, and then writing, re and re and ah, receiving that and banking that and then writing their other check, that just eliminated.

LF: Oh I understand, okay.

Ex. T–2 at 8–9.

DiLuzio also discussed the problems that might arise with the proposed method of transfer. *See* Ex. T–2 at 12–13.

Two months later, on December 23, 1978, in another recorded conversation, Furey reaffirmed DiLuzio's continued association with the plan by telling Flick that DiLuzio would still act as the "go-between" in the lot transfer. *See* Ex. T–4 at 4–5. At a later date, Furey met with Thomas Thornton, the then-tax assessor of Radnor Township, at DiLuzio's real estate office with the knowledge of DiLuzio. Thornton testified that he met DiLuzio at that meeting [N.T. 6–21]. According to Thornton, at the meeting Furey attempted to persuade Thornton that the tax assessment on the Ravenscliff project should be reduced and that, if it was reduced, it would be worth a "few dollars" to Thornton [N.T. 6–22].

DiLuzio's continued involvement was again exemplified on August 22, 1979, when Furey told Flick that monies should be paid to Furey by check but should be made by delivering the check to DiLuzio. The check was also to be made out to DiLuzio, according to a recorded conversation between Furey and Flick. *See* Ex. T–7 at 3–4. Soon thereafter, DiLuzio received that check from Flick and then mailed an allegedly false invoice to Flick in exchange for the check. *See* Ex. G–13.

On August 27, 1979, Special Agent Vaules of the FBI, working undercover, delivered a separate $5,000 check to DiLuzio, payable to him, at his real estate office [N.T. 6–107, 108 (testimony of FBI Agent Vaules)]. The following day, DiLuzio called Flick and told him that the check was insufficient because he had marked on it "per agreement with Ron Furey." *See* Ex. G–14. DiLuzio told Flick that this reference on the check "creates a problem for the mere fact of his position." *See* Ex. T–8 at 3. An arrangement was then worked out for the delivery to DiLuzio of a corrected check. *See* Ex. T–8 at 5, 6.

This brief review of the evidence presented against DiLuzio supports the Court's ruling at the conclusion of the Government's case that there was sufficient proof on the counts against DiLuzio for the matter to be sent to the jury and supports the jury's determination that DiLuzio was guilty of aiding and abetting Furey in committing attempted extortion.

The evidence, viewed in a light most favorable to the Government, *Glasser v. U.S., supra,* sufficiently indicated that DiLuzio was a willing participant in aiding, abetting and conspiring with Furey, in an attempt to extort monies from Flick and others, as stated in Counts I and III of the indictment. Indicative of this common plan or agreement was the evidence of a unity of purpose and intent to make the plan succeed, *see U.S. v. Kates,* 508 F.2d 308, 310–311 (3d Cir. 1975); *U.S. v. Newman,* 490 F.2d 139, 142 (3d Cir. 1974); *U.S. v. Barber,* 429 F.2d 1394, 1397 (3d Cir. 1970), such as the statements of DiLuzio in the October 23, 1978, telephone conversation with Flick in which he stated, after being questioned by Flick as to the payments being in exchange for a lower tax assessment:

LF: Okay, now, you know, I, you know, I hadn't met RON before, are you sure that he can deliver on the assessments, if we, you know, if we go forward with this?

JD: Well, I don't know, you know, what you and RON are doing ah, like I said um, or exactly what's taking place here, all he did was ah, inform me that ah, you know, I could get a deal here on the lot.

LF: Okay.

JD: And ah, from that particular point ah, what, if you're discussing something with him with ah, assessments, that's, you know, entirely out of my department, I don't know . . .

LF: Alright, well I . . .

JD: . . . a thing about . . .

LF: I, you know, we got a pretty good understanding on the thing.

JD: I don't know a thing about ah, you know, how that's working or what is, what his intentions are. Ah, that's his part of it and um, ah, whatever it is and the parts that

I'm talking about here is ah, you know, purchasing a lot period.

Ex. T–2 at 13–14.

Finally, the question of whether DiLuzio took any affirmative steps to leave the conspiracy to extort after March 1, 1979, was a question more properly reserved for the jury. The Court charged the jury as to the applicable law on this issue [N.T. 10–42, 43, 44]. That issue, like many other issues regarding DiLuzio's involvement in the plan, ultimately turned on the credibility and believability of the various witnesses at trial, including DiLuzio, Furey and Flick, and the jury's interpretation of the statements made in the numerous recorded conversations between those parties. The Court finds that the jury's verdict based on these issues is supported by the evidence in this case.

## VIII. *Length of Closing Arguments of Counsel*

■ DiLuzio objects that the Court prejudiced his right to a fair trial by limiting the length of closing statements by the defense attorneys to 30 minutes each. This time limit, DiLuzio argues, was not sufficient to fully discuss the complex issues raised in the instant action.

The courts have consistently held that the order and time length allocated to counsel for statements is a matter within the sound discretion of the trial judge. *U.S. v. White*, 589 F.2d 1283, 1289–1290 (5th Cir. 1979) (held that limiting argument for closing statements to 30 minutes per party was not an abuse of the court's discretion).

In the instant action, as the Government correctly notes, although certain aspects of the evidence regarding the determination and calculation of tax assessments were complicated, the majority of issues presented from a factual and legal viewpoint were undisputed. Relatively few factual and legal issues were in dispute, e. g., the content and meaning of the conversation between Furey, DiLuzio and Flick at the October 17, 1978, meeting; the purpose of the payments from Flick to Furey; the states of mind of Furey, DiLuzio and Flick; and, DiLuzio's involvement in and knowledge of the alleged extortion plan and whether at any time he affirmatively withdrew from that conspiracy.

The distillation of these few, albeit important, issues signifies that the defenses available to the two defendants overlapped to a substantial degree. It was for these reasons that the Court limited closing statements to 30 minutes per attorney. This combined time of one hour for both defendants stands in marked contrast to the mere 30 minutes afforded the Government to present its cases against both defendants.

Finally, the Court was extremely indulgent of counsel for DiLuzio during his closing statement because, according to the Court's own bench notes, his closing argument lasted for 45 minutes, thereby providing a surplus of 15 additional minutes.

Accordingly, because of the relative simplicity of the disputed factual and legal issues at trial, the Court finds that the time actually allowed for DiLuzio's closing was ample to permit his counsel to explain his position and defenses to the jury.

## IX. *Conclusion*

In conclusion, for the reasons stated in the foregoing, the Court will deny the motions of both defendants.[5]

An appropriate Order will be entered.

---

5. The other contentions raised by DiLuzio in his post-trial motions are additionally without merit: (1) as to the claim that the Court's charge on the concept of reasonable doubt was inadequate, this claim is meritless because the Court fully articulated the parameters of reasonable doubt and did include on three separate occasions, contrary to DiLuzio's claim, the requested charge that the Government must prove every element of the crime beyond a reasonable doubt [N.T. 10–45, 46]; (2) the statement in the Government's closing argument that DiLuzio served as a "bagman" for Furey was supported by the evidence and was not intended to be prejudicial, and did not have the effect of being prejudicial because the phrase is commonly understood to describe a person who serves as an intermediary for extortion payments, for which DiLuzio was charged, *see U.S. v. Duhon, supra* at 354–355 n.

5; (3) as to DiLuzio's contention that the Court erred in denying his pretrial motions for discovery, bill of particulars and to dismiss the indictment, the Court finds that it did not err for the identical reasons stated during the pretrial hearing held on those motions. At that time, the Court stated that, as to the discovery and bill of particular motions, all materials requested were either submitted by the Government, would be submitted or would not be submitted for what the Court found to be justifiable reasons supported by the judicial decisions set forth in the Government's response to

DiLuzio's motions. In regard to DiLuzio's motion to dismiss, the Court found that the indictment sufficiently stated the elements of the offenses charged to adequately apprise the defendant of the charges and, as shown during the pretrial hearing and at trial, the Ravenscliff corporate groups were legal entities doing business in interstate commerce in a significant degree by purchasing out-of-state construction materials used in the project development and by selling development homes to out-of-state purchasers. *See U.S. v. Mazzei, supra* at 642.